

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-1067-15

### Ex parte JAMES RICHARD "RICK" PERRY, Appellant

### ON APPELLANT'S AND STATE'S PETITIONS
### FOR DISCRETIONARY REVIEW
### FROM THE THIRD COURT OF APPEALS
### TRAVIS COUNTY

KELLER, P.J., delivered the opinion of the Court as to Parts I, II.B.3, III and IV in which KEASLER, HERVEY, ALCALA, YEARY and NEWELL, JJ., joined and announced the judgment of the Court and filed an opinion as to the remainder of Part II in which ALCALA and YEARY, JJ., joined. ALCALA, J., filed a concurring opinion. NEWELL, J., filed a concurring opinion which was joined by KEASLER and HERVEY, JJ. MEYERS, J., filed a dissenting opinion. JOHNSON, J., filed a dissenting opinion. RICHARDSON, J., did not participate.

This case arises from a governor's threat to exercise a veto and his ultimate exercise of that veto. Whether the State can prosecute the governor for these acts depends upon (1) whether prosecuting the exercise of a veto under the "abuse of official capacity" statute is a violation of the Separation of Powers provision of the Texas Constitution, and (2) whether the relevant portion of the "coercion of a public servant" statute, being used to prosecute the threat to exercise a veto, is

facially unconstitutional in violation of the First Amendment. Before reaching the first question, we must also decide whether the governor can raise his separation of powers complaint as an as-applied challenge in a pretrial habeas application followed by an interlocutory appeal. Answering these three questions in the affirmative, we reverse the judgment of the court of appeals with respect to count one, affirm the judgment of the court of appeals with respect to count two, and order the dismissal of the indictment.

## I. Background

### A. The Indictment and Pretrial Proceedings

The charges against the appellant, James Richard "Rick" Perry, arise from actions taken while he was governor of the State of Texas. A Travis County grand jury returned a two-count indictment against him. Count I alleged the offense of "abuse of official capacity,"[1] and Count II alleged the offense of "coercion of a public servant."[2] In a nutshell, Count I alleged that Governor Perry[3] abused his official capacity by misusing funds appropriated to the Public Integrity Unit of the Travis County District Attorney's Office, and Count II alleged that he coerced a public servant—District Attorney Rosemary Lehmberg—by threatening to veto the funds for that unit if she

---

[1] TEX. PENAL CODE § 39.02.

[2] *Id.* § 36.03.

[3] The Supreme Court has referred to a party by his title ("the President") rather than by his party designation when the party was the President of the United States and was involved in litigation arising from acts in that capacity. *See United States v. Nixon*, 418 U.S. 683 (1974). Because this case arises from acts of a governor in his capacity as governor, we refer to him by his title, and we include his last name to distinguish him from the current governor.

did not resign.[4]

The offense of abuse of official capacity is committed when a public servant, with intent to harm another, intentionally or knowingly misuses government property that has come into his custody or possession by virtue of his office or employment.[5] "Public servant" includes an officer of government,[6] such as a governor. Count I alleged the following:

> On or about June 14, 2013, in the County of Travis, Texas, James Richard "Rick" Perry, with intent to harm another, to-wit, Rosemary Lehmberg and the Public Integrity Unit of the Travis County District Attorney's Office, intentionally or knowingly misused government property by dealing with such property contrary to an agreement under which defendant held such property or contrary to the oath of office he took as a public servant, such government property being monies having a value of in excess of $200,000 which were approved and authorized by the Legislature of the State of Texas to fund the continued operation of the Public Integrity Unit of the Travis County District Attorney's Office, and which had come into defendant's custody or possession by virtue of the defendant's office as a public servant, namely, Governor of the State of Texas.

The offense of coercion of a public servant is committed when a person, by means of coercion, influences or attempts to influence a public servant in the exercise of a specific performance of his official duty.[7] The Penal Code provides several methods of engaging in coercion, but the definition of coercion at issue here is "a threat, however communicated . . . to take or

---

[4] The counts are out of order chronologically—the acts alleged in Count II precede the acts alleged in Count I.

[5] TEX. PENAL CODE § 39.02(a)(2). Although there are other statutory methods of committing abuse of official capacity, we focus solely on the statutory method described by the indictment's allegations. *See Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000) ("[T]he 'law' as 'authorized by the indictment' must be the statutory elements of the offense . . . as modified by the charging instrument.").

[6] TEX. PENAL CODE § 1.07(a)(41).

[7] *Id.* § 36.03(a)(1). Again, we focus solely on the statutory method of committing the offense that is described by the indictment's allegations.

withhold action as a public servant."[8] The coercion statute also provides an exception for certain official conduct.[9] The charging instrument must negate this exception, and the State must prove beyond a reasonable doubt that the exception does not apply.[10] Count II of the indictment alleged:

> Beginning on or about June 10, 2013, and continuing through June 14, 2013, in the County of Travis, Texas, by means of coercion, to-wit: threatening to veto legislation that had been approved and authorized by the Legislature of the State of Texas to provide funding for the continued operation of the Public Integrity Unit of the Travis County District Attorney's Office unless Travis County District Attorney Rosemary Lehmberg resigned from her official position as elected District Attorney, James Richard "Rick" Perry, intentionally or knowingly influenced or attempted to influence Rosemary Lehmberg, a public servant, namely, the elected District Attorney for Travis County, Texas, in the specific performance of her official duty, to-wit: the duty to continue to carry out her responsibilities as the elected District Attorney for the County of Travis, Texas through the completion of her elected term of office, and the defendant and Rosemary Lehmberg were not members of the same governing body of a governmental entity, such offense having been committed by defendant, a public servant, while acting in an official capacity as a public servant.

Governor Perry filed a motion to quash and dismiss the indictment and a pretrial application for a writ of habeas corpus. He claimed that the statutes underlying both counts were unconstitutional as applied to the charges against him. Included in his claims were allegations that the abuse-of-official-capacity statute was unconstitutional as applied because it infringed upon a governor's absolute right under the Texas Constitution to veto items of appropriation and because it violated the Texas Constitution's Separation of Powers clause. He also attacked Count II on the basis that the relevant portion of the coercion statute was facially unconstitutional because it was

---

[8] *Id.* § 1.07(a)(9)(F).

[9] *Id.* § 36.03(c).

[10] *Id.* § 2.02(b) ("The prosecuting attorney must negate the existence of an exception in the accusation charging the commission of the offense and prove beyond a reasonable doubt that the defendant or defendant's conduct does not fall within the exception.")

overbroad in violation of the First Amendment. The motion to quash also claimed that Count II failed to negate the exception found in § 36.03(c).

The trial court denied Governor Perry's motion to quash, but the court's order contained some qualifications. The order expressed the court's concern that Count I failed to specify what act constituted the misuse of government property: "[I]f the act of vetoing the appropriations bill funding the Public Integrity Unit is the act on which the State intends to rely . . . the indictment should say so. On the other hand, if the veto is not the act of alleged misuse, then [Governor Perry] . . . does not have sufficient notice of what facts support the State's claim of misuse." The trial court did not at that time act on that concern because the motion to quash had not challenged the indictment's lack of specificity. The order did say that the filing of a motion to quash challenging the sufficiency of the indictment would be permitted and that the State would be "permitted (and encouraged) to amend the indictment to plead Count I with more specificity, as suggested."

As to Count II, the trial court agreed with Governor Perry that the indictment failed to properly negate the exception found in § 36.03(c). The trial court concluded that the language "the defendant and Rosemary Lehmberg were not members of the same governing body of a governmental entity," which the State included in order to negate the exception, neither expressly nor implicitly did so. Nevertheless, the trial court found it premature to quash Count II of the indictment and, instead, ordered the State to amend the indictment to cure the defect.

The trial court otherwise denied the motion to quash and denied relief in the habeas action. As to the various as-applied claims, the trial court held that state law does not permit them to be raised pretrial. Regarding the facial challenge to Count II, the trial court held that neither of the statutes under which Governor Perry is being prosecuted is facially unconstitutional.

Responding to the trial court's suggestion that more specificity be pled in Count I and the trial court's order that the State amend Count II, the State filed a document titled "Bill of Particulars & Amendment of Indictment."[11] The bill of particulars identifies Governor Perry's veto of the funds for the Public Integrity Unit as the act of misuse in Count I.[12] In its amendment of Count II, the State struck the language found by the trial court to be inadequate to negate the exception and substituted the following language:

> . . . and it is further alleged that Rosemary Lehmberg was an elected district attorney in the Judicial Department (or Branch) of Texas, specifically, the District Attorney of Travis County, Texas, and the defendant was the chief officer of the Executive Department (or Branch) of Texas, specifically, the Governor of the State of Texas, and the defendant was therefore not a member of the governing body of a governmental entity in which Rosemary Lehmberg was a member, and the defendant's influence and attempt to influence Rosemary Lehmberg by means of an unlawful threat to veto legislatively-approved appropriation of funds did not constitute an official action taken by the defendant as a member of a governing body.

In written objections, Governor Perry argued that a bill of particulars is not recognized in Texas law. "It gives the *appearance* of notice to Governor Perry, while leaving the State free to shift strategies at trial if needed."[13] He also raised a number of objections to the State's amendment of Count II.

---

[11] After the trial court's rulings denying habeas relief and denying Governor Perry's initial motions to quash the indictment, Governor Perry filed a third motion to quash that alleged, among other things, that count one lacked specificity for the reasons the trial court had suggested. At a subsequent hearing, the trial court asked if the State intended to amend count one. The State's attorney pro tem responded "possibly" but that there were "other procedural vehicles that would satisfy the notice issue that the Court raised that possibly exists," including "a bill of particulars."

[12] The bill of particulars concerning Count I makes a number of other allegations, including allegations about Governor Perry's intent and what the State believes his duties were. Because these allegations are not relevant to the disposition of this case, we need not detail them here. The State's document also contains a bill of particulars as to Count II that we need not address.

[13] Emphasis in original.

## B. Appeal

Governor Perry filed an appeal in the court of appeals, claiming that the trial court erred in denying relief on the habeas application. The court of appeals recognized that at least some as-applied challenges can be addressed pretrial. Nevertheless, that court held that none of Governor Perry's as-applied claims were cognizable in a pretrial habeas action.[14] In arriving at that holding, the court of appeals relied upon our statements in prior cases that pretrial habeas may not be used to advance an as-applied challenge.[15] The court of appeals considered our decision in *Ex parte Boetscher*[16] as an "unstated qualification" of that principle but then held that Governor Perry's challenges were not like those in *Boetscher*.[17]

The court of appeals further concluded that Governor Perry's remaining proposed rationales for the fact that some as-applied challenges are allowed on pretrial habeas were not rooted "in any existing controlling precedent of the Court of Criminal Appeals" but in "broader 'factors' he identifies in what he terms the high court's 'evolving jurisprudence regarding cognizability in pretrial habeas.'"[18] The court of appeals rejected these rationales, saying that, as an intermediate court, it was not empowered "to 'evolve' or otherwise alter the binding effect of the Court of Criminal Appeals's controlling precedents," even if it might perceive sound justifications for doing so.[19]

---

[14] *Ex parte Perry*, 471 S.W.3d 63, 83-87 (Tex. App.–Austin 2015).

[15] *Id.* at 84.

[16] *Ex parte Boetscher*, 812 S.W.2d 600 (Tex. Crim. App. 1991).

[17] *Perry*, 471 S.W.3d at 84-85.

[18] *Id.* at 86.

[19] *Id.*

Finally, the court of appeals addressed a broader concern raised by Governor Perry and the amici who support him.[20]  In their view, this is a case in which a defendant who will inevitably be vindicated has nevertheless been made to face criminal charges of dubious legal viability (and/or politically motivated origins).[21]  In such circumstances, the eventuality of obtaining a favorable judgment at trial or on appeal will do little to rectify the harm the defendant suffers to reputation, professional standing, and the like in the meantime.[22]  They suggested in the court of appeals that inflicting such harms might, in fact, be the primary goal of those pursuing the charges.[23]  The court of appeals found itself bound by what it considered to be this Court's holdings and said that such potential harms, "however considerable they may be," are insufficient in themselves to provide a basis for relief through pretrial habeas corpus.[24]  The court of appeals rejected all of Governor Perry's challenges to Count I and rejected a number of his challenges to Count II.[25]

The court of appeals did, however, sustain Governor Perry's First Amendment overbreadth challenge to Count II.[26]  That court found Penal Code § 36.03(a)(1), as it incorporates the definition of "coercion" found in Penal Code §1.07(a)(9)(F), to be unconstitutional.[27]

---

[20]  *Id.* at 87.

[21]  *Id.*

[22]  *Id.*

[23]  *Id.*

[24]  *Id.*

[25]  *Id.*

[26]  *Id.* at 125-26.

[27]  *Id.* at 91-126.

The court of appeals recited a number of hypothetical situations offered by Governor Perry to illustrate the improper reach of the statute:

• A manager could not threaten to fire or demote a government employee for poor performance.

• A judge could not threaten to sanction an attorney for the State, to declare a mistrial if jurors did not avoid misconduct, or to deny warrants that failed to contain certain information.

• An inspector general could not threaten to investigate an agency's financial dealings.

• A prosecutor could not threaten to bring charges against another public servant.

• A public university administrator could not threaten to withdraw funding from a professor's research program.

• A public defender could not threaten to file a motion for suppression of evidence to secure a better plea bargain for his client.[28]

The court agreed that the statute would indeed criminalize these acts.[29] The court also offered its own hypotheticals: that the statute would appear to criminalize a justice's threat to write a dissenting opinion unless another justice's draft majority opinion were changed, and the court's clerk's threat, when a brief is late, to dismiss a government entity's appeal unless it corrects the deficiency.[30]

The State claimed that § 36.03(a)(1) and subsection (F) do not implicate the First Amendment at all. The State argued that under *Garcetti v. Ceballos,*[31] statements made by public officials do not constitute protected speech when uttered as part of the official's job, and that under

---

[28]  *Id.* at 103.

[29]  *Id.*

[30]  *Id.* at 103-04.

[31]  547 U.S. 410 (2006).

*Johanns v. Livestock Mktg. Ass'n,*[32] "government speech" is not protected.[33] The court rejected these claims, saying that, if the State were correct, "there would seem to be little left of the First Amendment's rights of speech and petition."[34] The court also concluded that most threats proscribed by the statute would fall under the protection of the First Amendment because only a relatively small fraction of the "threats" proscribed would constitute "true threats" (threats of force or violence) under the Supreme Court's jurisprudence.[35] The court of appeals said that threats do not lose First Amendment protection merely because they are designed to coerce action.[36]

The court of appeals acknowledged that the statutory provisions at issue would reach some threats that the State could properly proscribe criminally.[37] Included in these threats, the court said, would be threats designed to gain a prohibited personal benefit or threats of unlawful action.[38] But the court of appeals concluded that the statute would criminalize a number of threats that are part of the basic workings of government.[39]

The court of appeals further concluded that the statute was not narrowly drawn to serve a compelling state interest (as is required for content-based restrictions on protected expression) and

---

[32]  544 U.S. 550 (2005).

[33]  *See Perry*, 471 S.W.3d at 106-10.

[34]  *Id*. at 110.

[35]  *Id.* at 110-13.

[36]  *Id.* at 112-13.

[37]  *Id.* at 116.

[38]  *Id.*

[39]  *Id.* at 117-18.

that its infringement on protected speech was therefore not justified.[40]  In addressing whether the potential unconstitutional applications of the statute are substantial relative to legitimate ones, the court found the statute to be of alarming breadth, "reaching even a public servant's declared intention to take or withhold action lawfully, aimed at bringing about another public servant's lawful action that the first public servant could lawfully demand or require," even where there is a close relationship between the two actions.[41]  In response to the State's argument that no chilling effect has been demonstrated because there has been no widespread prosecution of public servants performing ordinary duties, the court of appeals observed that the statute has rarely been utilized—"at least until now."[42]  The court of appeals believed that the absence of prosecutions might also have been because of the Waco Court of Appeals case of *State v. Hanson*,[43] which held that a prior version of the statute was unconstitutionally vague in violation of the First Amendment.[44] Finally, the court of appeals concluded that no limiting construction could be used to save the statute.[45]

The court of appeals affirmed the trial court's denial of habeas relief as to Count I but reversed the denial of habeas relief as to Count II and ordered the trial court to dismiss Count II.

## II. Count I and Separation of Powers

---

[40]  *Id.* at 119-21.

[41]  *Id.* at 121-22.

[42]  *Id.* at 122.

[43]  793 S.W.2d 270 (Tex. App.–Waco 1990, no pet.).

[44]  *Perry*, 471 S.W.3d at 122.

[45]  *Id.* at 122-25.

## A. General Principles

### 1. Separation of Powers

Unlike the United States Constitution, the Texas Constitution contains an express Separation of Powers provision:

> The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.[46]

Our cases have given weight to this distinction: "All other things being equal, this textual difference between the United States and Texas constitutions suggests that Texas would more aggressively enforce separation of powers between its governmental branches than would the federal government."[47]  The Texas Separation of Powers provision is violated:

> (1) when one branch of government assumes or is delegated a power "more properly attached" to another branch, or

> (2) when one branch unduly interferes with another branch so that the other branch cannot effectively exercise its constitutionally assigned powers.[48]

### 2. Cognizability

We first address whether the court of appeals was correct in holding that Governor Perry's separation of powers claim is not cognizable on pretrial habeas.  Pretrial habeas, followed by an

---

[46]  TEX. CONST. art. II, § 1.

[47]  *State v. Rhine*, 297 S.W.3d 301, 315 (Tex. Crim. App. 2009) (Keller, P.J., concurring). *See Meshell v. State*, 739 S.W.2d 246 (Tex. Crim. App. 1987) (overturning Speedy Trial Act on separation of powers grounds).

[48]  *Ex parte Lo*, 424 S.W.3d 10, 28 (Tex. Crim. App. 2014).

interlocutory appeal, is an extraordinary remedy.[49] This remedy is reserved "for situations in which the protection of the applicant's substantive rights or the conservation of judicial resources would be better served by interlocutory review."[50] Except when double jeopardy is involved, pretrial habeas is not available when the question presented, even if resolved in the defendant's favor, would not result in immediate release.[51]

We have permitted double jeopardy and bail claims to be raised on pretrial habeas,[52] but we have disallowed its use to assert a claim involving a right to a speedy trial,[53] a challenge to the denial of a motion to suppress,[54] or a collateral estoppel claim that does not allege a double-jeopardy violation.[55] We have also said that pretrial habeas is generally not available to test the sufficiency of the charging instrument or to construe the meaning and application of the statute defining the offense charged.[56] We have held pretrial habeas to be an appropriate vehicle to assert a facial constitutional challenge to the validity of a statute, and, conversely, we have stated that pretrial habeas cannot be used to advance an as-applied constitutional challenge to a statute.[57] And we have

---

[49] *Ex parte Ellis*, 309 S.W.3d 71, 79 (Tex. Crim. App. 2010).

[50] *Ex parte Weise*, 55 S.W.3d 617, 620 (Tex. Crim. App. 2001).

[51] *Ex parte Doster*, 303 S.W.3d 720, 724 (Tex. Crim. App. 2010).

[52] *Weise*, 55 S.W.3d at 619.

[53] *Doster*, 303 S.W.3d at 724.

[54] *Weise*, 55 S.W.3d at 620.

[55] *Id.*

[56] *Ellis*, 309 S.W.3d at 79.

[57] *Id.*

said that pretrial habeas is unavailable "when the resolution of a claim may be aided by the development of a record at trial."[58]

The court of appeals relied on these statements to hold that Governor Perry could not litigate his as-applied claims before trial. We conclude, however, that the nature of the constitutional right at issue entitles him to raise these claims by pretrial habeas corpus.

## B. Analysis

### 1. As-Applied

Although we have said that as-applied challenges are not cognizable before trial, we allow certain types of claims to be raised by pretrial habeas because the rights underlying those claims would be effectively undermined if not vindicated before trial.[59] Within this category of rights that would be effectively undermined if not vindicated pretrial, we have, so far, recognized the constitutional protections involving double jeopardy and bail.[60] Facial constitutional challenges, however, are cognizable on pretrial habeas regardless of whether the particular constitutional right at issue would be effectively undermined if not vindicated prior to trial. When we say that as-applied challenges are not cognizable pretrial, what we mean is that, unlike with facial challanges, the unconstitutionality of a statute as applied is not, *in the abstract*, a basis for invoking the pretrial writ. But, as will be discussed further below, certain types of as-applied claims may be raised by pretrial habeas because the particular constitutional right at issue in the as-applied challenge is the type that

---

[58] *Doster*, 303 S.W.3d at 724.

[59] *Weise*, 55 S.W.3d at 619.

[60] *Id.*

would be effectively undermined if not vindicated prior to trial.[61]

The "effectively undermined if not vindicated prior to trial" rationale for allowing certain claims on pretrial habeas derives from the Supreme Court's decision in *Abney v. United States*,[62] a double-jeopardy case. In *Abney*, the Supreme Court decided that the resolution of a claim of former jeopardy fell within the "collateral order exception" to the general prohibition against interlocutory appeals in the federal system.[63] One reason the Court gave for permitting an interlocutory appeal when a trial is barred by double jeopardy is that the defendant would lose an aspect of the Double Jeopardy Clause's protection by being forced to endure a trial that the Double Jeopardy Clause was designed to prohibit.[64] "[I]f a criminal defendant is to avoid *exposure* to double jeopardy and thereby enjoy the full protection of the Clause, his double jeopardy challenge to the indictment must be reviewable before that subsequent exposure occurs."[65] In *Ex parte Robinson*, we adopted this rationale to hold that a "right not to be exposed to double jeopardy" is cognizable on pretrial habeas and reviewable in an interlocutory appeal from the habeas proceeding.[66]

---

[61] A plurality of this Court has indicated that there are occasions when a double-jeopardy claim is itself an as-applied challenge to a statute. *See Ex parte Chaddock*, 369 S.W.3d 880, 886 (Tex. Crim. App. 2012) (plurality op.) ("To the extent that Section 71.03(3) purports to authorize successive prosecutions for engaging in organized criminal activity and for the commission of one of the lesser-included predicate offenses listed in 71.02(a), we hold that it does indeed operate unconstitutionally.").

[62] 431 U.S. 651 (1977).

[63] *Id.* at 659-62.

[64] *Id.* at 661.

[65] *Id.* (emphasis in original).

[66] 641 S.W.2d 552, 554-55 (Tex. Crim. App. 1982) (discussing *Abney*). *See also Ex parte Granger*, 850 S.W.2d 513, 515 n.3 (Tex. Crim. App. 1993) (citing *Abney*).

Federal courts have applied *Abney* to issues other than double jeopardy. In *Helstoski v. Meanor*, the Supreme Court applied *Abney*'s holding to claims arising out of the United States Constitution's Speech and Debate Clause.[67] Analogizing to *Abney*, the Court held that if a member of Congress "is to avoid *exposure* to being questioned for acts done in either House and thereby enjoy the full protection of the Clause, his challenge to the indictment must be reviewable before exposure to trial occurs."[68] And in *Nixon v. Fitzgerald*, the Supreme Court relied in part on *Abney* and *Helstoski* to hold that an interlocutory appeal in a civil case on the issue of presidential immunity was allowed "[i]n light of the special solicitude due to claims alleging a threatened breach of essential Presidential prerogatives under the separation of powers."[69]

Relying on *Abney* and *Helstoski*, several of the federal circuits have held that interlocutory appeal is available for some separation of powers claims in a criminal case.[70] Each of these cases involved the prosecution of a public official who claimed that his own powers were being unconstitutionally infringed upon.[71] In addressing the separation of powers claim of a member of

---

[67] 442 U.S. 500, 506-07 (1979).

[68] *Id.* at 507 (quoting *Abney*) (emphasis in original, brackets and ellipses omitted).

[69] 457 U.S. 731, 742-43 (1982). The Supreme Court has further extended this rationale to claims of qualified immunity, to the extent such a claim turns on an issue of law. *Mitchell v. Forsyth*, 472 U.S. 511, 524-30 (1985).

[70] *United States v. Myers*, 635 F.2d 932, 935-36 (2d Cir. 1980); *United States v. Claiborne*, 727 F.2d 842, 844-45 (9th Cir. 1984); *United States v. Hastings*, 681 F.2d 706, 708-09 (11th Cir. 1982); *United States v. Durenberger*, 48 F.3d 1239, 1241-42 (D.C. Cir. 1995). *See also United States v. Levine*, 658 F.2d 113, 125 (3d Cir. 1981) (observing extension of *Helstoski* rationale employed by Second Circuit to separation of powers issue); *United States v. Bird*, 709 F.3d 388, 391 n.13 (5th Cir. 1983) (noting Second Circuit's treatment of separation of powers issue).

[71] Some federal circuit courts have dismissed attempted interlocutory appeals when a separation of powers claim asserted an infringement of another person's or entity's official powers.

Congress in *United States v. Myers*, the Second Circuit commented that "the doctrine of separation of powers serves as a vital check upon the Executive and Judicial Branches to respect the independence of the Legislative Branch, not merely for the benefit of the Members of Congress, but, more importantly, for the right of the people to be fully and fearlessly represented by their elected Senators and Congressmen."[72] The *Myers* court found that the need to protect legislators was of such importance that "it would not be too extravagant to suggest that a Member of Congress should be entitled to pre-trial review of the denial of any legal claim that could be readily resolved before trial and would, if upheld, prevent trial or conviction on a pending indictment."[73] Echoing the concerns expressed in *Myers*, the Third Circuit observed the effect that the threat of criminal prosecution can have on an elected public official's performance of his constitutionally assigned duties:

> We must recognize that the mere issuance of an indictment has a profound impact on the accused, whether he be in public life or not. Particularly for a member of Congress, however, publicity will be widespread and devastating. Should an election intervene before a trial at which he is found innocent, the damage will have been done, and in all likelihood the seat lost. Even if the matter is resolved before an election, the stigma lingers and may well spell the end to a political career. Far from being hyperbolic, this evaluation of an indictment's effect is coldly realistic. It cannot be doubted, therefore, that the mere threat of an indictment is enough to intimidate the average congressman and jeopardize his independence.[74]

---

*See United States v. Wampler*, 624 F.3d 1330,1338-39 (10th Cir. 2010) (defendants contended that district court improperly usurped the Executive's prosecutorial function); *United States v. Cisneros*, 169 F.3d 763, (D.C. Cir. 1999) (prospective nominee for cabinet position could not rely on alleged infringement of President's power to establish jurisdiction for an interlocutory appeal—"The immunity, if any, is the President's alone.") (distinguishing *Durenberger* and *Rostenkowski*).

[72] *Myers*, 635 F.2d at 935-36.

[73] *Id.* at 936.

[74] *United States v. Helstoski*, 635 F.2d 200, 205 (3d Cir. 1980). Although the claim in *Helstoski* was based on the Speech and Debate Clause rather than separation of powers, the Third Circuit cited to the *Myers* case in its discussion, *see id.* at 206, and the observation would appear to

Although the *Myers* case discussed the importance of protecting a member of Congress,[75] other Circuit cases have allowed interlocutory review of separation of powers claims made by federal judges who were under indictment.[76]

In accordance with the rationale of *Myers* and federal cases, as well as *Abney* and *Helstoski*, and in light of our more aggressive enforcement of separation of powers in Texas,[77] we hold that the type of separation of powers claim in this case may be resolved prior to trial. If a statute violates separation of powers by unconstitutionally infringing on a public official's own power, then the mere prosecution of the public official is an undue infringement on his power. And given the disruptive effects of a criminal prosecution, pretrial resolution of this type of separation of powers claim is necessary to ensure that public officials can effectively perform their duties.[78] We conclude that pretrial habeas is an available vehicle for a government official to advance an as-applied separation of powers claim that alleges the infringement of his own power as a government official.[79]

---

apply equally to the separation of powers claim at issue in *Myers*.

[75] *See also Durenberger*, 48 F.3d at 1242; *United States v. Rostenkowski*, 59 F.3d 1291, 1297 (D.C. Cir. 1995).

[76] *See Claiborne*, 727 F.2d at 844; *Hastings*, 681 F.2d at 708.

[77] *See Rhine*, 297 S.W.3d at 315 (Keller, P.J., concurring); *Meshell*, 739 S.W.2d 246.

[78] The court of appeals suggested that some of the same concerns behind allowing pretrial resolution of Governor Perry's claims were also present in the *Ellis* and *DeLay* cases. *See Perry*, 471 S.W.3d at 87 & n.102. This is understandable given the allegations of a politically motivated prosecution. However, neither of those cases involved a separation of powers claim, and the charges were based upon election activities and not upon the public official's performance of his duties. *See DeLay v. State*, 465 S.W.3d 232 (Tex. Crim. App. 2014); *Ellis*, 309 S.W.3d 71.

[79] Governor Perry's brief identifies some "key considerations" that he says are taken into account in determining whether a claim is cognizable on pretrial habeas, including: (1) whether the right at stake would be effectively undermined if the issue were not resolved pretrial, and (2) whether

Consequently, Governor Perry may obtain pretrial resolution of his separation of powers claim that alleges the infringement of his veto power as governor of the State of Texas.

## 2. Record Development

The State contends that another hurdle to pretrial cognizability is this Court's past refusal to allow pretrial resolution of issues that would require the development of facts. A key unresolved fact, according to the State, is whether the act constituting "misuse" of the funds for the public integrity unit is the Governor's veto. The indictment does not specify the act of "misuse." Although the State's "Bill of Particulars" specifies that the "misuse" was the Governor's veto, the State contends that it is not bound by that document because the allegations in it can be abandoned or revised before trial. At oral argument, the State also contended that the bill of particulars is not a recognized pleading in Texas law.

The cases that have stated that pretrial resolution is not available when factual development is necessary did not involve constitutional rights (like double jeopardy) that include a right to avoid

---

judicial economy would be best served by deciding the issue pretrial. These two considerations reflect our statement in *Weise* that the remedy of pretrial habeas is reserved "for situations in which the protection of the applicant's substantive rights or the conservation of judicial resources would be better served by interlocutory review." *See* 55 S.W.3d at 620. Of these two considerations, the first—focusing on the nature of the right at stake—is the one that more obviously compels pretrial review. Judicial economy may sometimes *favor* pretrial review, but the nature of the right at stake can *compel* it. Moreover, pretrial habeas enhances judicial economy only if the habeas applicant wins; it actually hinders judicial economy if the habeas applicant loses. For these reasons, an appellate court ought to first consider whether the right at stake provides a basis for cognizability and only secondarily address whether judicial economy favors pretrial review. Consequently, because Governor Perry has raised a claim involving a right that compels pretrial review, we resolve cognizability on that basis and leave for another day the impact that judicial economy considerations may have on the cognizability of certain types of claims. *See Perry*, 471 S.W.3d at 81-85 (discussing unanswered questions regarding the continued viability and significance of the *Boetscher* case).

trial.[80] As we have explained, a separation of powers claim that alleges infringement of the governor's power involves a constitutional right that includes a right to avoid trial by litigating the issue before trial. We have, in fact, relied upon pretrial factual development to resolve, pretrial, claims that involve a constitutional right that includes a right to avoid trial, like former jeopardy.[81]

When the trial judge said that Count I gave Governor Perry insufficient notice of the charges against him and the judge made it clear that he would consider granting a motion to quash on that basis if one were filed, the State responded by alleging in its bill of particulars that the misuse of power was the veto. Regardless of whether a bill of particulars is a "recognized" pleading,[82] the

---

[80] *See State ex rel. Lykos v. Fine*, 330 S.W.3d 904, 909-10 (Tex. Crim. App. 2011) (challenge to punishment provision of capital-murder scheme); *Doster*, 303 S.W.3d at 724-27 (speedy-disposition claim under the IAD with this Court concluding that the IAD speedy-disposition right was "much more like the right to a speedy trial than the right against Double Jeopardy"); *Gillenwaters v. State*, 205 S.W.3d 534, 536-37 (Tex. Crim. App. 2006) (claim that statute was unconstitutionally vague as applied); *Ex parte Smith*, 185 S.W.3d 887, 893 (Tex. Crim. App. 2006) (*in pari materia* claim).

[81] *See Ex parte Coleman*, 940 S.W.2d 96, 97-98 (Tex. Crim. App. 1996); (considering testimony from prosecutor that the prior case and the pending case involved theft of the same items); *May v. State*, 726 S.W.2d 573, 574, 576 n.6, 576-77 (Tex. Crim. App. 1987) (styled (correctly) in the court of appeals as *Ex parte May*, 682 S.W.2d 326 (Tex. App.–Dallas 1984)) (considering the testimony of the prosecutor from the prior case and the prosecutor from the pending case that showed the same instance of driving was involved in the two cases); *Ex parte Rathmell*, 717 S.W.2d 33, 34 (Tex. Crim. App. 1986) (considering parties' stipulation that the same automobile accident was involved in the prior case and the pending case and agreeing that the claim was cognizable on pretrial habeas). The State contends that modern double jeopardy law requires only a comparison of the charging instruments, but that is not always true because "allowable unit of prosecution" issues sometimes require an examination of evidence beyond the pleadings. *Ex parte Benson*, 459 S.W.3d 67, 74 (Tex. Crim. App. 2015); *see also Maldonado v. State*, 461 S.W.3d 144, 149-50 (Tex. Crim. App. 2015) (looking beyond the pleadings at evidence of separate instances of sexual contact).

[82] By providing that the indictment is the "*primary* pleading in a criminal action," the Code of Criminal Procedure indicates by inference "that other, ancillary pleadings by the State are possible," including those that convey notice of intent to seek a deadly weapon finding or notice of intent to seek enhancement of punishment through the use of a prior conviction. *Brooks v. State*, 957 S.W.2d 30, 32 (Tex. Crim. App. 1997) (quoting TEX. CODE CRIM. PROC. art. 27.01, emphasis in

allegations in such a document may constitute admissions that we can consider on pretrial habeas, just as we have considered pretrial admissions by the State in double jeopardy cases.[83]  Even if the State has latitude to abandon such an admission,[84] the State has not attempted to do so in the present case, nor has the State suggested that its bill of particulars was inaccurate in alleging the veto as the sole act of misuse.  We will hold the State to its allegation in the bill of particulars that the veto is the sole act of misuse on which the State relies.

### 3. The Veto

We now turn to the merits of Governor Perry's separation of powers claim.[85]  Article IV, § 14 of the Texas Constitution gives the governor the authority to veto legislation.[86]  The provision

_____

*Brooks*).

[83]  *See supra* n.81.

[84]  We need not address what circumstances would permit the State to abandon a pretrial admission, but at least two factors would seem to weigh against permitting an abandonment here. First, the State's bill of particulars was made in response to a danger that the charges would otherwise be dismissed for lack of notice.  The State specifically represented to the trial court that the bill of particulars was an available method of satisfying the notice concerns that Governor Perry and the trial court had expressed.  *See supra* n.11.  And second, given the separation of powers purpose of protecting against undue interference with the exercise of official power, one would expect the State to already have (at the time of indictment) a factual basis for prosecution that does not violate separation of powers.  Using an indictment as a mechanism for engaging in a fishing expedition for such a factual basis would be the sort of harassment that the separation of powers protection is designed to prevent.  *See supra* parts II.A.1 and II.B.1.

[85]  We agree with the Supreme Court's sentiments, when faced with a separation-of-powers-immunity type issue in *Nixon*, that we need not remand this case to the court of appeals for resolution.  *See Nixon*, 457 U.S. at 743 n.23.  Several factors—the importance of the interests protected by the Separation of Powers clause, the purely legal nature of the issue before us, and concerns of judicial economy that are amplified by the need to speedily resolve the type of issue before us—all counsel in favor of us addressing the merits of the separation of power claim now. *See id.*

[86]  TEX. CONST. art. IV, § 14.

places temporal limits on that authority,[87] and it limits the governor's authority to veto only part of a bill.[88] The provision also authorizes the Legislature to override a veto with the vote of two-thirds of the members present in each House.[89] The Constitution does not purport to impose any restriction on the veto power based on the reason for the veto, and it does not purport to allow any other substantive limitations to be placed on the use of a veto.

In the *Pocket Veto Case*, the United States Supreme Court emphasized the importance of the veto as a part of our system of government and explained that Congress could not, directly or indirectly, limit the President's power to veto bills:

> The Constitution in giving the President a qualified negative over legislation—commonly called a veto—entrusts him with an authority and imposes upon him an obligation that are of the highest importance, in the execution of which it is made his duty not only to sign bills that he approves in order that they may become law, but to return bills that he disapproves, with his objections, in order that they may be reconsidered by Congress. . . . The power thus conferred upon the President cannot be narrowed or cut down by Congress, nor the time in which it is to be exercised lessened, directly or indirectly.[90]

We conclude that this applies equally to the governor's veto in Texas. The Legislature cannot directly or indirectly limit the governor's veto power. No law passed by the Legislature can constitutionally make the mere act of vetoing legislation a crime. And while the definition of misuse includes "to deal with property contrary to . . . an agreement under which the public servant holds

---

[87] *Id.*

[88] *Id.*; *Jessen Assoc. v. Bullock*, 531 S.W.2d 593, 596 (Tex. 1975).

[89] TEX. CONST. art. IV, § 14.

[90] 279 U.S. 655, 677-78 (1929).

the property,"[91] and the indictment alleges this definition as an alternative method of misuse, the

governor cannot by agreement, on his own or through legislation, limit his veto power in any manner

that is not provided in the Texas Constitution.[92]

Other state courts of last resort have held that the governor's veto power is absolute if it is

exercised in compliance with the state constitution and that courts may not examine the motives

behind a veto or second-guess the validity of a veto.[93] In discussing the power of the governor to

recommend or revoke a conditional pardon, we made similar statements that apply with even greater

force to a governor's veto:

> Neither has this court any power over the acts of the Governor so long as he is within
> the law and the matter involved is one of his judgment and discretion in the
> performance of his duty assigned to him by the Constitution as is the matter before
> us. Whether or not his acts are harsh, ill advised, and arbitrary, is not a matter for this
> court to decide and that question so earnestly insisted upon by appellant is not given

---

[91] TEX. PENAL CODE § 39.01(2)(A).

[92] Although we are holding that the present prosecution violates separation of powers, we need not decide whether the abuse-of-official-capacity statute itself violates separation of powers by infringing on Governor Perry's veto power. Governor Perry raised a number of other substantial challenges to the indictment. There are serious questions about whether the State could prove the existence of an agreement that Governor Perry could have acted contrary to, whether a veto could ever be a violation of his oath of office, whether the Governor could be said to exercise custody or possession of funds appropriated by the Legislature to a different government entity, and whether the Governor could be said to exercise custody or possession of funds authorized in a portion of a bill that (because of the veto) never became law. We need not address these questions. It is enough to say here that, if the statute criminalizes the charged conduct, as the State claims, it would unconstitutionally infringe on the Governor's veto power.

[93] *Johnson v. Carlson*, 507 N.W.2d 232, 235 (Minn. 1993) ("It is not for this court to judge the wisdom of a veto, or the motives behind it, so long as the veto meets the constitutional test."); *Barnes v. Secretary of Administration*, 411 Mass. 822, 828, 586 N.E.2d 958, 961 (1992) ("We have never inquired into a Governor's motives in the use of the line item veto power. The language of the constitutional amendment clearly authorizes the Governor's reduction; his action was wholly lawful, and our inquiry ends there.").

consideration. The Governor acted and he had the power to do so.[94]

The governor's power to exercise a veto may not be circumscribed by the Legislature, by the courts, or by district attorneys (who are members of the judicial branch).[95] When the only act that is being prosecuted is a veto, then the prosecution itself violates separation of powers.[96] We sustain Governor Perry's separation of powers challenge to Count I.

### III. Count II and Overbreadth

### A. Overbreadth and Statutory-Construction Principles

The First Amendment protects, among other things, the freedom of speech.[97] The First Amendment right to freedom of speech applies to the states by virtue of the Fourteenth Amendment.[98] Under the First Amendment's "overbreadth" doctrine, a law may be declared unconstitutional on its face, even if it might have some legitimate applications.[99] A challenge to a statute under the overbreadth doctrine is a facial challenge that can be brought in a pretrial habeas

---

[94] *Ex parte Ferdin*, 147 Tex. Crim. 590, 593, 183 S.W.2d 466, 467-68 (1944).

[95] *See* TEX. CONST. art. V, §§ 21, 30.

[96] A governor could be prosecuted for bribery if he accepted money, or agreed to accept money, in exchange for a promise to veto certain legislation, and a governor might be subject to prosecution for some other offense that involves a veto. But the illegal conduct is not the veto; it is the agreement to take money in exchange for the promise. *See Mutscher v. State*, 514 S.W.2d 905, 914-15 (Tex. Crim. App. 1974). That is not what the State has alleged.

[97] U.S. CONST. amend. I ("Congress shall make no law . . . abridging the freedom of speech.").

[98] *West Virginia Board of Education v. Barnette*, 319 U.S. 624, 638-39 (1943).

[99] *United States v. Stevens*, 559 U.S. 460, 473 (2010); *Sabri v. United States*, 541 U.S. 600, 609-10 (2004).

application, and the denial of relief may be immediately appealed.[100]

The overbreadth of a statute must be "substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep."[101] The statute must prohibit a substantial amount of protected expression,[102] and the danger that the statute will be unconstitutionally applied must be realistic[103] and not based on "fanciful hypotheticals."[104] The person challenging the statute must demonstrate from its text and from actual fact "that a substantial number of instances exist in which the Law cannot be applied constitutionally."[105]

The first step in an overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what it covers.[106] In construing a statute, we give effect to the plain meaning of its language unless the language is ambiguous or the plain meaning leads to absurd results that the legislature could not have possibly intended.[107] In determining plain meaning, we consult dictionary definitions, apply rules of grammar, and consider

---

[100] *Ex parte Thompson*, 442 S.W.3d 325, 333, 342 n.91, 349 (Tex. Crim. App. 2014).

[101] *United States v. Williams*, 553 U.S. 285, 292 (2008).

[102] *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002); *Thompson*, 442 S.W.3d at 349-50.

[103] *Regan v. Time*, 468 U.S. 641, 651 n.8 (1984); *Thompson*, 442 S.W.3d at 350.

[104] *See Stevens*, 559 U.S. at 485 (Alito, J., dissenting) (citing *Williams*, 553 U.S. at 301-02).

[105] *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1988).

[106] *Williams*, 553 U.S. at 293.

[107] *Thompson*, 442 S.W.3d at 340; *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991).

words in context,[108] and we presume that every word in a statute has been used for a purpose and that each word, clause, and sentence should be given effect if reasonably possible.[109] When the meaning of statutory language is not plain, or leads to absurd results, extratextual factors that may be considered include: (1) the object sought to be attained, (2) the circumstances under which the statute was enacted, (3) the legislative history, (4) common law or former statutory provisions, including laws on the same or similar subjects, (5) the consequences of a particular construction, (6) administrative construction of the statute, and (7) the title (caption), preamble, and emergency provision.[110] A Texas court has a duty to employ, if possible, a reasonable narrowing construction in order to avoid a constitutional violation, but such a construction should be employed only if the statute is readily susceptible to one.[111]

Even if a narrowing construction is not feasible, a state court may cure an overbreadth problem by severing a portion of the statute.[112] We have recognized that a facial challenge may be made to a portion of a definition within a statute.[113] Whether an overbreadth analysis should be limited to only a portion of the statute depends on the feasibility of severing invalid portions.[114] The

---

[108] *Lopez v. State*, 253 S.W.3d 680, 685 (Tex. Crim. App. 2008).

[109] *Yazdchi v. State*, 428 S.W.3d 831, 837 (Tex. Crim. App. 2014).

[110] *Chase v. State*, 448 S.W.3d 6, 11 (Tex. Crim. App. 2014).

[111] *Thompson*, 442 S.W.3d at 339; *Long v. State*, 931 S.W.2d 285, 295 (Tex. Crim. App. 1996). *See also Stevens*, 559 U.S. at 481.

[112] *New York v. Ferber*, 458 U.S. 747, 769 n.24 (1982).

[113] *Ellis*, 309 S.W.3d at 71, 80-81 (considering the facial validity of a portion of the definition of "funds" in the money-laundering statute).

[114] *See Ferber*, 458 U.S. at 769 n.24.

feasibility of severance depends upon the extent to which we can reconcile the full protection of First Amendment liberties with the discernable intent of the Legislature.[115] Severance is not feasible if the valid and invalid statutory provisions at issue are inextricably intertwined so that a severance would render the statute incomplete or contrary to legislative intent.[116]

### B. Focus of the Overbreadth Challenge

The coercion-of-a-public-servant statute, Penal Code § 36.03, provides in relevant part:

(a) A person commits an offense if by means of coercion he:

(1) influences or attempts to influence a public servant in . . . a specific performance of his official duty.

\* \* \*

(c) It is an exception to the application of Subsection (a)(1) of this section that the person who influences or attempts to influence the public servant is a member of the governing body of a governmental entity, and that the action that influences or attempts to influence the public servant is an official action taken by the member of the governing body. For the purposes of this subsection, the term "official action" includes deliberations by the governing body of a governmental entity.[117]

"Coercion" is not defined in § 36.03, but it is defined in § 1.07, the Penal Code's general

---

[115] *See Acosta v. City of Costa Mesa*, 718 F.3d 800, 821 (9th Cir. 2013). *See also Alaska Airlines v. Brock*, 480 U.S. 678, 684-85 (1987) ("The standard for determining the severability of an unconstitutional provision is well established: 'Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law' . . . . The more relevant inquiry in evaluating severability is whether the statute will function in a *manner* consistent with the intent of Congress.") (internal quotation marks omitted, emphasis in original).

[116] *See People v. Tate*, 352 P.3d 959, 975 (Colo. 2015); *Conseco Fin. Servicing Corp. v. Mo. Dep't of Revenue*, 98 S.W.3d 540, 546 (Mo. 2003).

[117] Tex. Penal Code § 36.03(a)(1), (c).

definition section,[118] and the definition applies to several other offenses.[119] Governor Perry does not claim that there is anything wrong with the definition of "coercion" by itself; it is the use of the definition as it is incorporated into § 36.03 that he contends is the problem.

The definition of "coercion" sets forth several meanings in six subsections,[120] but Governor Perry and the court of appeals have taken issue only with subsection (F), and only with a portion of that subsection: "a threat, however communicated . . . to take or withhold action as a public servant . . . ."[121] This is the definition alleged in the indictment, and it involves activity that is distinct from the other subsections in the definition of coercion, so we agree that an overbreadth challenge may focus on this particular statutory meaning of coercion and that Governor Perry is not required to demonstrate that § 36.03 is overbroad with respect to all of the definitions of coercion in § 1.07(a)(9). Our overbreadth analysis is, therefore, limited to the portion of § 36.03(a)(1) and (c) that, after incorporating the language from § 1.07(a)(9)(F), proscribes the following offense:

> A person commits an offense if by means of a threat, however communicated, to take or withhold action as a public servant, he influences or attempts to influence a public servant in a specific performance of his official duty.

> It is an exception . . . that the person who influences or attempts to influence the public servant is a member of the governing body of a governmental entity, and that the action that influences or attempts to influence the public servant is an official

---

[118] *Id.* § 1.07(a)(9).

[119] *See id.* §§ 20A.01(2), 20A.02(a)(3), 31.01(3)(A), 33.01(12)(A), 38.12(d)(2)(E).

[120] TEX. PENAL CODE § 1.07(a)(9)(A)-(F).

[121] *Id.* § 1.07(a)(9)(F). The court of appeals observed that Governor Perry's arguments were directed entirely at the above-quoted portion material, constituting the first half of subsection (F), so that the court had no occasion to resolve the constitutional implications of the second half of subsection (F) ("a threat, however communicated . . . to cause a public servant to take or withhold action"). *Perry*, 471 S.W.3d at 95 n.149.

action taken by the member of the governing body. For the purposes of this subsection, the term "official action" includes deliberations by the governing body of a governmental entity.

## C. Narrowing Constructions[122]

### 1. "Threat"

Relying upon *Olivas v. State*,[123] the State would have us narrow the meaning of the word "threat" in the definition of "coercion" to "a communicated intent to inflict harm or loss on another or on another's property."[124] The State would substitute this definition for the word "threat" in the statutory definition of "coercion," so that the definition of "coercion" reads: "a communicated intent to inflict harm or loss on another or another's property, however communicated, to take or withhold action as a public servant."

This attempt to restrict the meaning of the term "threat" is misguided. The definition cited in *Olivas* was not intended to be a definition of the word "threat" in all possible contexts. The *Olivas* court was addressing the meaning of the word "threaten" in the assault statute, and the question was whether a victim had to perceive the actor's conduct for that conduct to "threaten" the victim.[125] "Threat" can also be defined more broadly as "[a]n expression of an intention to inflict something

---

[122] We assume, *arguendo*, that the State is correct in claiming that the coercion statute does not cover a manager's threat to discipline a subordinate because the manager in that situation does not act "as a public servant" but, instead, as an employer. *See Garcetti,* 547 U.S. at 422 (referring to "the emphasis in our precedents on affording government employers sufficient discretion to manage their operations").

[123] 203 S.W.3d 341 (Tex. Crim. App. 2006).

[124] *See id.* at 346 (quoting Threat, BLACK'S LAW DICTIONARY (7th ed. 2000)).

[125] *Id.* at 345.

harmful"[126] or "[a] declaration of an intention or determination to inflict punishment, injury, etc., in retaliation for, or conditionally upon, some action or course."[127]

One indication that the State's proposed definition of "threat" is too narrow is the fact that it makes the statute ungrammatical—a fact that becomes clearer if one omits the modifying phrase "however communicated." The statute ought to make grammatical sense when the modifier is omitted, and it does if we stick with the original language: "a threat . . . to . . . take or withhold action as a public servant." But with the State's definition, the statute would read: "a communicated intent to inflict harm or loss on another or another's property to take or withhold action as a public servant."

Another indication that the State's proposed definition is too narrow is that it conflicts with the language of the specific subsections in the statutory definition of "coercion." Several of the subsections specify that "another" or a "person" is the victim (personally or financially) of the anticipated harm at issue:

(B) to inflict bodily injury in the future on the *person* threatened or *another*;

(C) to accuse a *person* of any offense;

(D) to expose a *person* to hatred, contempt, or ridicule;

(E) to harm the credit or business repute of any *person*.[128]

If anticipated harm to "another or another's property" were necessarily associated with any type of

---

[126] *Threat*, WEBSTER'S II NEW COLLEGE DICTIONARY (1999).

[127] *Threat*, RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (2d ed. [unabridged] 1987).

[128] TEX. PENAL CODE § 1.07(a)(9)(B)-(E) (emphasis added).

threat, there would be no need to specify "another" or a "person" as the victim in these subsections.

Moreover, two subsections (including the one incorporating the method of coercion at issue before

us) do *not* specify "another" or "a person" as the victim of the anticipated harm:

> (A) to commit an offense,

> * * *

> (F) to take or withhold action as a public servant, or to cause a public servant to take
> or withhold action.[129]

Not all offenses are committed against persons or the property of persons. By specifying "person"

in other subsections but leaving it out in subsection (A), the Legislature indicated that *any* offense

could be the subject of a threat, regardless of whether it causes loss to another or another's property.

The same appears to be true of the subsection (F) method of coercion.

Consequently, contrary to the State's contention, subsection (F) is broad enough to cover (for

example) a trial judge's expression of an intent to grant a mistrial or an appellate judge's expression

of an intent to write a dissenting opinion.[130] Grammatical considerations and the structure of the

statutory definition of "coercion" both counsel in favor of according the word "threat" a broad

construction. And because the definition of "coercion" applies to other statutes (e.g. theft),[131] we are

not free to arbitrarily carve out a different meaning simply to avoid First Amendment complications

arising from its application to the statute before us.[132]

---

[129] *Id.* § 1.07(a)(9)(A), (F).

[130] But, as we shall see below, the appellate judge would be exempt from prosecution under the "governing body" exception in § 36.03(c).

[131] *See supra* note 119.

[132] *Thompson*, 442 S.W.3d at 340-41.

## 2. The Statutory Exception

### a. Generally

The negation of any exception to the offense of coercion of a public servant is an element of that offense,[133] so the scope of such an exception—whether it is to be construed narrowly or broadly—must be considered in an overbreadth analysis. We again set out the exception in § 36.03(c):

> It is an exception to the application of Subsection (a)(1) of this section that the person who influences or attempts to influence the public servant is a member of the governing body of a governmental entity, and that the action that influences or attempts to influence the public servant is an official action taken by the member of the governing body. For the purposes of this subsection, the term "official action" includes deliberations by the governing body of a governmental entity.[134]

To understand the scope of the exception, we need to know when a public servant is a member of the governing body of a governmental entity, and what constitutes official action of such a member. The terms "official action," "governing body," and "governmental entity" are not defined in § 36.03 or in the general definitions section of the Penal Code. The term "governmental entity" appears to be purposefully broad—including the state, counties, municipalities, the Legislature, courts, boards, commissions, departments, offices, state agencies, and other units of government—and that impression is confirmed by definitions found in other statutes.[135]

### b. "Governing Body"

---

[133] TEX. PENAL CODE § 1.07(a)(22)(D); *Martinez v. State*, 879 S.W.2d 54, 55 n.4 (Tex. Crim. App. 1994). *See also* TEX. PENAL CODE § 2.02.

[134] TEX. PENAL CODE § 36.03(c).

[135] *See e.g.* TEX. GOV'T CODE §§ 572.056(c), 615.101, 2007.002(1), 2051.041(1), 2054.375(1), 2109.001(1), 2251.001(3), 2252.001(2), 2252.031(1), 2252.121(3), 2253.001(1), 2254.002(1), 2267.001(5).

The most recent version of Black's Law Dictionary defines "governing body" as "[a] group of (esp. corporate) officers or persons having ultimate control."[136]  A prior version of Black's Law Dictionary defines the "governing body" of an "institution, organization or territory" as "that body which has ultimate power to determine its polices and control its activities."[137]  A key issue here is whether a governing body under the exception can be composed of a single individual (like a governor) or whether it  must be composed of more than one individual.  We agree with other state supreme courts that the natural meaning of "governing body" refers to a group of individuals, not a single individual.[138]  The sense in which "body" is used within "governing body" is "a group of people . . . regarded or functioning as a unit."[139]  The statutory exception's references to "a member" and to "the member" of the governing body further support the conclusion that the term "governing body" was meant to refer to more than one individual.[140]  In a number of other Texas statutes,

---

[136]  *Governing Body*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[137]  *Governing Body*, BLACK'S LAW DICTIONARY (5th ed. 1979).

[138]  *Herald Co. v. City of Bay City*, 463 Mich. 111, 129, 614 N.W.2d 873, 882 (2000) ("The statutory terms used illustratively to define 'public body'—'legislative body and governing body'—do not encompass individuals."); *Kagan v. Caroselli*, 30 N.J. 371, 379-80, 153 A.2d 17, 23 (1959) ("To recapitulate, the Legislature provided that the appointment shall be made by the 'governing body.' The natural meaning of the term is the board of commissioners. For the reasons stated, there is no incongruity with the provisions of the Walsh Act relating to the distribution of the powers possessed by local government and hence no basis for denying 'governing body' its normal meaning.  There is no apparent reason why the Legislature would have intended but one of the directors to exercise the power.").  *See also Roach v. Springfield Clinic*, 157 Ill. 2d 29, 42, 623 N.E.2d 246, 252 (1993) ("a 'committee' is comprised of a body or group of persons, not just a single individual").

[139]  *See Body*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY (4th ed. 2000) (noun definition 6, examples: "a body of soldiers" and "an advisory body").

[140]  *See* TEX. PENAL CODE § 36.03(c).

"governing body" means an entity composed of more than one member.[141] We have found a handful of statutes from other states that define "governing body" in a particular context to include an individual.[142] Although defining "governing body" to include an individual may be a possible construction, it is an unnatural and unlikely one.

If we assume that such an unnatural and unlikely construction renders the statute ambiguous, the legislative history of § 36.03(c) buttresses the natural reading of "governing body" as being composed of more than one individual. The "supporters say" section of the bill analysis for the amendment that added § 36.03(c) refers only to bodies composed of more than one member. It explains that the exception would "allow members of governmental bodies, such as county commissioners courts, to exercise their authority through the budget and oversight process without

---

[141] *See* e.g. TEX. EDUC. CODE § 12.026 (referring to "members of the governing body" of a school district); TEX. ELEC. CODE § 2.051(b) (referring to "members of the political subdivision's governing body"); TEX. GOV'T CODE §§ 306.007 (referring to minutes of "meetings of the agency's governing body"), 418.1102(b)(2) (referring to exemption from quorum requirements for "a majority of members of the governing body" of a local government entity), 651.008(a)(1) (referring to a "governing body" composed of "an even number of voting members"), 651.009(a) (requiring appointing authority to ensure, to the extent possible, for the governing body of a statewide entity that "the membership of the governing body reflects the racial, ethnic, and geographic diversity of this state"), 660.002(2) ("'Board' means a board, commission, committee, council, governing body, or similar entity in the executive, legislative, or judicial branch of state government that is composed of two or more members."); TEX. LOCAL GOV'T CODE § 22.010 ("If for any reason a single vacancy exists on the governing body of the municipality, a majority of the remaining members, excluding the mayor, may fill the vacancy by appointment unless an election to fill the vacancy is required by Article XI, Section 11, of the Texas Constitution.").

[142] FLA. STAT. § 192.001(7) (general taxation provisions); *Id.* § 383.302(5) (maternal and infant care); LA. R.S. § 37:1301(A)(1) (nonprofit hospitals; discrimination prohibited); N.M. STAT. ANN. § 10-7E-4(B) (public employee bargaining); NY CLS PUB HEALTH § 206-a(11)(a) (discrimination in hospital staff appointments and privileges prohibited); R.I. GEN. LAWS § 23-20.9-4(3) (smoking in schools); *but see* FLA. STAT. § 343.91 (relating to regional transportation authorities: "'Members means the individuals constituting the governing body of the authority").

fear of being hauled before a grand jury on allegations of coercion."[143] The "supporters say" section of the bill analysis further says, "Under the current law, someone could even try to bring criminal charges against a legislator for wielding the budget hammer over state agencies to force necessary improvements or for 'horsetrading' or 'logrolling' bills with a colleague."[144] On the House floor, Representative Wolens expressed the need to protect county commissioners and legislators.[145]

The bill analysis also contains an "other opponents say" section that maintained that the bill, in creating an exception for members of governing bodies, did not go far enough to protect all public officials.[146] "Rather than make an exception only for members of governing bodies," this part of the bill analysis states, "the law should be clarified to apply only to threats by public officials to take *unlawful* action. That change would apply to all public servants—not only to county commissioners but to tax assessor-collectors and other stand-alone offices as well."[147] These "other opponents" ultimately prevailed in part: A floor amendment added the word "unlawfully" to the definition of "coercion" that applied to public-administration offenses so that it read "a threat, however communicated . . . to unlawfully take or withhold action as a public servant, or to cause a public servant to unlawfully take or withhold action."[148] In 1994, with the restructuring of the Penal Code,

---

[143] House Research Organization, 71st Leg., Bill Analysis, H.B. 594 (March 14, 1989) (SUPPORTERS SAY paragraph one).

[144] *Id.* (SUPPORTERS SAY paragraph five).

[145] Rep. Wolens, 71st Leg., House floor, H.B. 594, 2nd reading (March 14, 1989).

[146] HRO Bill Analysis (OTHER OPPONENTS SAY paragraph one).

[147] *Id.* (emphasis in original).

[148] *See* Rep. Parker, 71st Leg., House floor, H.B. 594, 2nd reading (March 14, 1989) (stating that the amendment would add language from the Model Penal Code); Acts 1989, 71st Leg., ch. 67,

the Legislature deleted the definitions of "coercion" from various specific statutes and added a definition of "coercion" in § 1.07 (the general definitions statute) that omits the word "unlawfully" from subsection (F).[149]

By focusing on the need to protect county commissioners and legislators, while indicating that "stand-alone" offices would have been left unprotected by the "governing body" language, the legislative history supports the natural construction of "governing body" as an entity that consists of more than one individual. The Legislature followed the recommendation to protect public officials who were not members of governing bodies by adding "unlawfully" to the subsection (F) version of the definition of "coercion" that applied to public-administration offenses, but when the definition of "coercion" was consolidated under the general definitions section of the Penal Code in 1994, this protection was lost.

So, the language and the legislative history support reading "governing body" as a controlling governmental unit that consists of more than one individual. To construe the term "governing body" to include a controlling position held by a single individual—e.g. governor, comptroller, tax assessor-collector—would broaden the meaning of that term beyond its natural import and, more to the point, beyond what it appears that the Legislature contemplated. Given the language of the statute and the legislative history, this broadening of the term is not a construction to which the

§ 2. *See also* Model Penal Code § 212.5(1) ("A person is guilty of criminal coercion if, with purpose *unlawfully* to restrict another's freedom of action to his detriment, he threatens to . . . .") (emphasis added). The "other opponents" also recommended a conforming change (adding "unlawfully") to the then-identical definition of "coercion" applicable to theft offenses, then Penal Code § 31.01(1)(F), *see* HRO Bill Analysis (OTHER OPPONENTS SAY paragraph two), but that recommendation was not adopted. *See* TEX. PENAL CODE § 31.01(1) (West 1990).

[149] *See* Acts 1993, 73rd Leg., ch. 900, § 1.01, eff. Sept. 1, 1994. This definition was identical to the one previously contained in the theft statute. *See* TEX. PENAL CODE § 31.01(1) (West 1990).

statute is reasonably susceptible, and so we cannot impose it as a narrowing construction.[150]

### c. "Official Action"

The remaining question in construing the exception is whether "official action" has a narrow meaning or a broad meaning. Some ambiguity surrounds the meaning of the term. Does the term "official action" mean only the bare exercise of an official power, or does it also include conduct that is performed in one's official capacity? That is, does official action mean only the government actor's vote, veto, or decision, or does it also include communications (*e.g.* threats) regarding an anticipated vote, veto, or decision?

The exception provides that official action "includes" deliberations by the governing body.[151] To that extent, the exception unambiguously includes conduct other than the mere exercise of an official power such as voting. The question is whether the exception includes other conduct, such as a threat to exercise an official power that is made in a context other than deliberations within a governing body. That is, does the exception extend to "cross-entity threats"—a threat to exercise an official power made by a member of the governing body of one governmental entity to a person in a different governmental entity?

The "deliberations" language may be the reason that the State contends, both here and in its indictment, that the exception applies only when both the issuer and the recipient of the threat are members of the same governing body. But "includes" is a term "of enlargement and not of limitation or exclusive enumeration" and its use "does not create a presumption that components not expressed

---

[150]  *See Thompson*, 442 S.W.3d at 342 ("[C]ourts should be circumspect about using a 'narrowing construction' that actually broadens the meaning of a term.").

[151]  TEX. PENAL CODE § 36.03(c).

are excluded."[152]  Nothing in the language of the exception would otherwise require that the issuer and the recipient of the threat be members of the same governing body.

Further, the Fifth edition of Black's Law Dictionary defines "official act" as "[o]ne done by an officer in his official capacity under color and by virtue of his office."[153]  This definition would include a cross-entity threat to exercise an official power.  The exception is at least ambiguous as to whether it covers cross-entity threats, so we turn to legislative history.

And the legislative history settles the matter: "official action" includes cross-entity threats. The HRO bill analysis explains that the coercion-of-a-public-servant law had "recently been abused in counties where allegations of coercion have been made against members of the commissioners court for threatening to take actions that they are lawfully entitled to take."[154]  The bill analysis specifically cited a case in Bosque County, "where the county judge was indicted for allegedly threatening to have the salaries of some county employees eliminated in order to force certain county officials to take a particular action."[155]  The Bosque County case to which the bill analysis refers was *State v. Hanson*.[156]  *Hanson* involved the prosecution of a constitutional county judge who threatened "to terminate the county's funding of the salaries of a deputy district clerk and an assistant district attorney in an attempt to coerce the district judge into firing the county auditor and the county

---

[152]  TEX. GOV'T CODE § 311.005(13); *Ellis*, 309 S.W.3d at 81 & n.51.

[153]  *Official* (*official act*), BLACK'S LAW DICTIONARY 978 (5th ed. 1979).  The tenth edition does not contain a definition of "official act."  *See* BLACK'S LAW DICTIONARY (10th ed. 2014).

[154]  HRO Bill Analysis (SUPPORTERS SAY paragraph two).

[155]  *Id.*

[156]  *See State v. Hanson*, 793 S.W.2d 270 (Tex. Crim. App. 1990).

attorney into revoking a misdemeanant's probation."[157] The constitutional county judge is a member of the county commissioners' court but the district judge, county attorney, deputy district clerk, and assistant district attorney are not.[158] So, cross-entity threats were the very basis of the prosecution against the defendant in *Hanson*. The legislative history provides us with another example of a cross-entity threat contemplated by the Legislature: The bill analysis expressed the fear that, without the exception, the coercion law might be used "against a legislator for wielding the budget hammer over state agencies."[159] But a legislator is not a member of the same branch of government as most state agencies, much less a member of the same governing body, so the threat contemplated was cross-agency.

The digest of the HRO bill analysis says that the exception "would apply only if the attempt to influence a public servant was an official action taken as a member of the governing body."[160] So, although the recipient of the threat does not have to be a member of the same governing body as the maker of the threat, the maker of the threat must be making the threat as a member of the governing body and not in some other official capacity. The exception would exempt a county judge from criminal liability for threatening to do something in his capacity as a member of the commissioners court that decides budgetary issues for the county[161] but not for threatening to do something in his

---

[157]  *Id.* at 271. The district judges of a county appoint the county auditor. *See* TEX. LOCAL GOV'T CODE § 84.002.

[158]  *See* TEX. CONST. art. V, § 18(b).

[159]  *See* HRO Bill Analysis (SUPPORTERS SAY paragraph five).

[160]  HRO Bill Analysis (DIGEST).

[161]  *See* TEX. CONST. art. V, § 18(b) (county judge is presiding officer of county commissioners court).

capacity as the judge of the county court that resolves litigation.[162]

In light of the definition of "official act" in Black's Law Dictionary and the legislative history, we conclude that the term "official action" includes any threat by a member of a governing body to take action as a member of the governing body, regardless of whether the recipient of the threat is a member of the same governing body. The result of this construction, along with our construction of the term "governing body," is that the subsection (c) exception will exempt many public servants from criminal liability for virtually any kind of threat that would otherwise fall within the subsection (F) definition of "coercion."

The exception would, for example, cover legislators, judges on appellate courts, members of commissioners courts, city council members, members of school boards, and members of various commissions. Some government officers, e.g. constitutional county judges, serve in a dual capacity, and would be exempted only for threats to take action as a member of a governing body. Other officials, notably those in the executive branch of government and other trial judges, would not be covered by the exception for their usual duties, though the exception would apply if the individual were a member of the governing body of some other governmental entity (such as a legislatively created commission) and issued a threat to act as a member of that governing body. The exception greatly narrows the reach of the statute, but that narrowing is based on the status of the public servant making the threat rather than the nature of the threat itself. So, while the class of public servants that are subject to criminal sanctions has been narrowed (to those who do not belong to a governing body or are not acting under the color of that governing body), the question remains whether § 36.03 penalizes a substantial amount of protected conduct with respect to the narrowed class in relation

---

[162] *See id.* § 16.

to the statute's legitimate application to the narrowed class.

## D. Constitutional Analysis

### 1. The First Amendment is Implicated.

As we noted above, in its brief to the court of appeals, the State contended, "Statements made by public officials to other public officials are unprotected under *Garcetti* and its progeny and are no more entitled to First Amendment protection than criminal threats or extortion." The State, now represented by the State Prosecuting Attorney, has backed away from these statements. In its petition for discretionary review, the State acknowledges that it knows of "no cases applying the government speech theory to criminal prosecutions." In its brief before us, the State acknowledges that "*Garcetti* was an employment law case, and arguably, when the State criminalizes speech, it is acting not as an employer, but as a sovereign."

The State Prosecuting Attorney is wise to back away from these earlier claims made by the attorney pro tem. When government seeks criminal punishment, it indeed acts as sovereign[163] and not as employer or speaker.[164] We hold that the First Amendment is implicated in this case.

---

[163] *See Oregon v. Ice*, 555 U.S. 160, 170 (2009) ("[T]he authority of States over the administration of their criminal justice systems lies at the core of their sovereign status."); *Pasquantino v. United States*, 544 U.S. 349, 362 (2005) ("This is a criminal prosecution brought by the United States in its sovereign capacity to punish domestic criminal conduct.").

[164] *See Dep't of Hous. v. Rucker*, 535 U.S. 125, 135 (2002) ("But both of these cases deal with the acts of government as sovereign. In *Scales*, the United States criminally charged the defendant with knowing membership in an organization that advocated the overthrow of the United States Government. In *Danaher*, an Arkansas statute forbade discrimination among customers of a telephone company. The situation in the present cases is entirely different. The government is not attempting to criminally punish or civilly regulate respondents as members of the general populace. It is instead acting as a landlord of property that it owns, invoking a clause in a lease to which respondents have agreed and which Congress has expressly required."); *Cleveland v. United States*, 531 U.S. 12, 23 (2000) ("Notably, the Government overlooks the fact that these rights include the distinctively sovereign authority to impose criminal penalties for violations of the licensing

## 2. Legitimate Applications Are Few

The State contends that the legitimate sweep of the coercion statute includes "unprotected speech in the nature of bribery and extortion" and the solicitation of criminal activity. Referring to its brief in the court of appeals, the State argues that the statute would legitimately proscribe "a legislator's vote or governor's veto that punishes a police department, district attorney's office, or judicial district if a traffic ticket is not torn up or a prosecution is not dismissed." In its brief in the court of appeals, the subject of the traffic ticket or prosecution in these hypotheticals was a friend or a family member. As another example, the State suggests the statute would legitimately proscribe a threat by a district judge to dismiss a lawsuit that a legislator filed if the legislator did not vote for judicial pay raises.

Most, if not all, of the coercive activity by government officials that a legislature might legitimately proscribe—including the activity suggested by the State—is proscribed more specifically by other statutory provisions. For instance, the State can legitimately prohibit threats that are intended to coerce someone to engage in illegal activity, but the text of § 36.03(a)(1) itself contains the alternative element "influences or attempts to influence a public servant to violate the public servant's known legal duty."[165] And the State can validly prohibit threats to do illegal acts, but the definition of "coercion" also proscribes "a threat . . . to commit an offense."[166] And because "abuse

scheme."). *See also Healy v. James*, 408 U.S. 169, 201-02 (1972) (Rehnquist, J., concurring) ("Cases such as *United Public Workers v. Mitchell*, 330 U.S. 75 (1947), and *Pickering v. Board of Education*, 391 U.S. 563 (1968), make it equally clear that the government in its capacity as employer also differs constitutionally from the government in its capacity as the sovereign executing criminal laws.").

[165] TEX. PENAL CODE § 36.03(a)(1).

[166] *Id.* § 1.07(a)(9)(A).

of official capacity" is an offense, a wide range of unauthorized activity by a public servant is already illegal.[167] The State's examples of seeking the dismissal of a traffic ticket or prosecution for a family member or the seeking of a pay raise for oneself all involve attempts to obtain a personal benefit. As such, those examples fall within the bribery statute.[168]

The State argues, however, that in analyzing the legitimate reach of the statute, it is improper to exclude conduct that is proscribed by other statutes. The State complains that, in *Ex parte Lo*[169] and *State v. Johnson*,[170] we made a mistake in excluding conduct covered by other statutes from the legitimate sweep of the challenged statute. The State contends that "[e]xamples of speech that is not protected by the First Amendment are correctly considered as part of the coercion statute's legitimate sweep, even if that speech could also be legitimately prosecuted under another statute." The State claims that, "the fact that statutes might overlap is not a basis for an appellate court to eliminate conduct from the coverage of the statute being challenged." The State suggests that there is "no

---

[167] *See id.* §§ 39.01, 39.02.

[168] A person is guilty of bribery if, among other things, he "intentionally or knowingly . . . solicits . . . from another . . . any benefit as consideration for the recipient's . . . exercise of discretion as a public servant." *Id.* § 36.02(a)(1). The term "solicit" is broad, requiring "no particular degree of importunity, entreaty, imploration, or supplication." *Solicit*, BLACK'S LAW DICTIONARY (5th ed. 1979). "Benefit" has a specialized meaning under the bribery statute and is defined to mean "anything reasonably regarded as pecuniary gain or pecuniary advantage, including benefit to any other person in whose welfare the beneficiary has a direct and substantial interest." TEX. PENAL CODE § 36.01(3). Coercive behavior designed to obtain a personal benefit may also fall under the theft statute. *See* TEX. PENAL CODE §§ 31.01(3)(A) ("Consent is not effective if induced by deception or *coercion*." (emphasis added)), 31.03(a), (b)(1) (offense committed if person "unlawfully appropriates property with intent to deprive the owner of property" and "[a]ppropriation is unlawful if . . . it is without the owner's effective consent").

[169] 424 S.W.3d 10 (Tex. Crim. App. 2013).

[170] 475 S.W.3d 860 (Tex. Crim. App. 2015).

apparent reason to disregard those legitimate applications, except to suggest that the criminal jurisprudence would not be diminished by the statute's absence." That, says the State, "is a question for the legislature, not the courts."

The State's approach raises concerns. With legitimate applications flowing solely, or almost entirely, from conduct proscribed by other statutes, it could be said that the challenged statute has no life of its own. In *City of Los Angeles v. Patel*, the Supreme Court held that a statute that authorizes the police to inspect hotel records could not be upheld against a facial challenge on the basis that inspections pursuant to a warrant or exigent circumstances constitute valid applications.[171] In those situations, the statute "do[es] no work."[172] "[T]he proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant."[173] If the so-called legitimate applications of a challenged statute are covered by other statutes, then arguably the challenged statute does "no work."

At oral argument, amici for Governor Perry suggested another reason why we should take into account whether the legitimate applications of a contested statute are already proscribed by other statutes. The concern behind the substantiality requirement of an overbreadth analysis is that "overbreadth doctrine is strong medicine" that has bad side effects. One side effect might be that finding a statute unconstitutionally overbroad could take out of play a valuable law that is necessary to prevent some real harm. If that harm is already being prevented by other statutes, then finding the

---

[171] 135 S. Ct. 2443, 2451 (2015).

[172] *Id.*

[173] *Id.* Whether a warrant may issue may itself be a matter of statutory authorization. *See* TEX. CODE CRIM. PROC. art. 18.02.

statute overbroad is not particularly strong medicine and that side effect is not really present.

Nevertheless, even if the State were correct as a general matter, its position is unavailing here because the legitimate sweep of the statute is still vanishingly small. Each of the "illegal threat" provisions cited above is embedded, not only within the same Penal Code section as the provision upon which the State relies, but within the same subsection as an alternative element. The State would like for this Court to count the activity that is specifically proscribed by these (uncharged) alternative statutory elements as legitimate applications of the portions of the statute that it did charge. We cannot agree with the State's position because we presume that each word, clause, or sentence in a statute should be given effect, and the State's position is contrary to that presumption.

Unlike the "illegal threat" provisions, bribery is proscribed by a different statute than coercion of a public servant. But bribery is also proscribed by the Texas Constitution, which articulates the elements of that offense.[174] Given this constitutional proscription, we cannot conclude that the Legislature intended to criminalize bribery in statutes that do not contain all of the

---

[174] TEX. CONST. art. 16, § 41 ("Any person who shall, directly or indirectly, offer, give, or promise, any money or thing of value, testimonial, privilege or personal advantage, to any executive or judicial officer or member of the Legislature to influence him in the performance of any of his public or official duties, shall be guilty of bribery, and be punished in such manner as shall be provided by law. And any member of the Legislature or executive or judicial officer who shall solicit, demand or receive, or consent to receive, directly or indirectly, for himself, or for another, from any company, corporation or person, any money, appointment, employment, testimonial, reward, thing of value or employment, or of personal advantage or promise thereof, for his vote or official influence, or for withholding the same, or with any understanding, expressed or implied, that his vote or official action shall be in any way influenced thereby, or who shall solicit, demand and receive any such money or other advantage, matter or thing aforesaid for another, as the consideration of his vote or official influence, in consideration of the payment or promise of such money, advantage, matter or thing to another, *shall be held guilty of bribery, within the meaning of the Constitution, and shall incur the disabilities provided for said offenses, with a forfeiture of the office they may hold, and such other additional punishment as is or shall be provided by law*.") (emphasis added).

constitutionally required elements.[175] Obtaining a personal benefit is a constitutionally required element of bribery, but it is not an element of coercion of a public servant.

Once we eliminate threats to do illegal acts, threats to procure illegal acts, and bribery, there does not seem to be much (if anything) left that would constitute a legitimate application of the combination of statutory provisions that we are focusing on in this case. The statute still criminalizes communications that are coercive, but the fact that speech is coercive does not, alone, mean that it can legitimately be proscribed: "[s]peech does not lose its protected character . . . simply because it may embarrass others or coerce them into action."[176] And political logrolling—which involves the swap of one authorized official act for another[177]—"has never before been condemned as extortion."[178]

### 3. Unconstitutional Applications are Many

As we have explained, public servants have a First Amendment right to engage in expression, even threats, regarding their official duties.[179] Given our construction of the "governing body" exception, officials subject to criminal liability under the provisions at issue in this case include any public servant who, as a single individual, controls a governmental entity. This includes the Governor, Attorney General, Comptroller, Secretary of State, Land Commissioner, tax-assessor collectors, and trial judges. Many threats that these public servants make as part of the normal

---

[175] *See id.*

[176] *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 910 (1982).

[177] *United States v. Blagojevich*, 794 F.3d 729, 735 (7th Cir. 2015).

[178] *Id.* at 736.

[179] *See supra* part III.D.1 and nn. 176-78 and accompanying text.

functioning of government are criminalized:

   • a threat by the governor to veto a bill unless it is amended,[180]

   • a threat by the governor to veto a bill unless a different bill he favors is also passed,[181]

   • a threat by the governor to use his veto power to wield "the budget hammer" over a state agency to force necessary improvements,[182]

   • a threat by the comptroller to refuse to certify the budget unless a budget shortfall

---

[180]   *See* Mike Ward, *Abbott Tells House, Senate: Cut Business Tax*, HOUSTON CHRONICLE, B1, (April 16, 2015) (3 star edition) ("This much is clear about all the tax talk at the Texas Capitol: Gov. Greg Abbott is not backing off one bit on his demand to reduce business taxes or his pledge to veto any budget that does not include such a cut. . . . 'With regard to the veto word, I don't want to go throwing that out there loosely,' he told reporters. 'I've thrown down my one veto threat. I'll leave it at that right now.'"); Jason Embry, *Texas' Longest-Serving Governor Has Expanded Office's Power*, AUSTIN AMERICAN-STATESMAN, A5 (February 10, 2010) (final edition) ("Some lawmakers, such as Watson, say Perry is disengaged during much of the legislative session, until it comes time for him to kill legislation with vetoes. Others take a more favorable view. 'He can and does share his opinion early on of issues he would support and not support,' said Sen. Dan Patrick, a Houston Republican and one of Perry's most outspoken legislative allies. 'If I were governor, I would use the veto threat, absolutely, to push the legislation and agenda I wanted pushed.'"); Liberal Arts Instructional Technology Services, University of Texas at Austin, TEXAS POLITICS, § 5.1, http://www.laits.utexas.edu/txp_media/html/exec/0501.html (December 17, 2015) ("A skillful governor can use the threat of the veto to influence legislation during the session.").

[181]   *See Rural Chiefs Have Leverage in Fights Over Choice*, EDUCATION WEEK, vol. 26, no. 13, p. 17 (November 29, 2006) ("While some rural, Republican states are fighting [school] choice plans, some states with Democrats in power are accepting laws that expand it. The reasons range from the influence of the Roman Catholic Church to the horse-trading that goes on between governors and legislators of different parties, analysts say."); Richard Sammon, *So Now What? Bush Must Adapt to Democratic Gains,* KIPLINGER BUSINESS FORECASTS, Vol. 2006, No. 1110 (November 8, 2006) ("Bush's history as governor of Texas suggests that he can work with a Democratic legislature, horse-trading to get at least part of what he wants."); *How Dubya Did at School*, THE ECONOMIST (April 1, 2000) (U.S. edition) ("There was some useful horse-trading: Paul Sadler, a Democrat who at the time chaired the Texan lower house's Public Education Committee, emphasised more money for education in general, and Mr. Bush pushed for tougher penalties for bad schools.").

[182]   *See supra* n.144 (referring to legislators wielding the budget hammer).

is eliminated,[183]

• a threat by the attorney general to file a lawsuit if a government official or entity proceeds with an undesired action or policy,[184]

• a threat by a public defender to file, proceed with, or appeal a ruling on a motion to suppress unless a favorable plea agreement is reached,[185]

• A threat by a trial judge to quash an indictment unless it is amended.

Of these, the only example involving anything unusual is the one in which the comptroller actually followed through with her threat not to certify the budget. At least some of these examples, involving the governor and the attorney general, involve logrolling, part of "the 'usual course of

---

[183] *See* Pete Slover, *Strayhorn's Budget Rejection Becomes Historic Decision*, DALLAS MORNING NEWS, A16 (June 20, 2003) (second edition) ("Ms. Strayhorn is the first comptroller to employ the ultimate leverage of not certifying the spending plan. But, she and her recent predecessors have a practically uninterrupted history of nudging the budget with the threat of rejection."); April Castro, *Comptroller Rejects Two Year, $185.9 Million State Budget*, AP, 101-02 (June 19, 2003) (Thursday, BC cycle) ("'We need a certifiable "pay as you go" budget by mid-July or the schools won't open in September,' Strayhorn said.").

[184] *See* Kiah Collier, *Paxton Asks EPA to Halt Global Warming Plan*, THE TEXAS TRIBUNE, http://www.texastribune.org/2015/08/20/paxton-asks-epa-stay/ (August 20, 2015) ("Renewing his vow to sue if the answer is no, Texas Attorney General Ken Paxton on Thursday officially asked the Environmental Protection Agency to halt a sweeping plan designed to combat climate change while existing legal challenges from other states play out."); *Texas Attorney General Threatens to Sue EPA,* KWTX 10, http://www.kwtx.com/news/state/headlines/Texas-Attorney-General-Threatens-To-Sue-EPA-270931801.html (August 12 2014) ("Texas Attorney General Greg Abbott is threatening to sue if the U.S. Environmental Protection Agency doesn't scrap a proposal to expand the definition of federal waterways."); Editorial, *Loose Cannons on Guns*, DALLAS MORNING NEWS, A20 (January 25, 2013) (first edition) ("The previous week, Texas Attorney General and prospective gubernatorial candidate Greg Abbott used Twitter to threaten a 'double-barreled lawsuit' if a city passed an ordinance banning gun shows on city property."); April Castro, *AG Ready to Sue to Certify Budget; Waiting for Negotiations*, AP (June 20, 2003) (Friday, BC cycle) ("'I have it ready to be filed,' Abbott said outside the Supreme Court where the case would be filed. 'My belief is that meaningful progress has been made with regard to budgetary issues and that matters will be resolved shortly.' If not, he said, 'I will be forced to file that lawsuit.'").

[185] *See Marsh v. State*, 444 S.W.3d 654, 660 (Tex. Crim. App. 2014) (defendant waived right to appeal motion to suppress as part of plea agreement).

business' in politics."[186]

Another indication of the pervasive application that the statute has to protected expression is that the last example we listed above occurred in this very case. Concluding that quashing Count II would be premature, the trial court ordered the State to amend Count II of Governor Perry's indictment. But a trial court has no authority to order the State to amend an indictment; the State has the right to stand on its indictment and appeal any dismissal that might result from refusing to amend.[187] The trial court's order that the State amend the indictment was, in practical terms, a threat to quash Count II if it were not amended. And the trial court's exact words are of no moment because the statute refers to a threat "however communicated."[188] The regular and frequent violation of the statute by conduct that is protected by the First Amendment suggests that the statute is substantially overbroad.[189]

The State contends, however, that substantial overbreadth has not been shown because "there is no evidence that in the years since the coercion statute was enacted, any public servant has been chilled." But when the "governing body" exception was being considered by the Legislature, there

---

[186] *Blagojevich*, 794 F.3d at 736.

[187] *State v. Plambeck*, 182 S.W.3d 365, 370-71 (Tex. Crim. App. 2005) ("Rather, it is the State's right to stand on its charging instrument and have an appellate court pass on whether the trial court's reasons for dismissal were sufficient."); *State v. Moreno*, 807 S.W.2d 327, 333-34 (Tex. Crim. App. 1991) ("The fact that the State has appealed the decision of the trial court should be sufficient indication to the Court of Appeals that the State is unwilling to alter the indictment or information and that for all practical purposes, the prosecution in the trial court has 'terminated.'").

[188] *See* TEX. PENAL CODE § 1.07(a)(9).

[189] *See City of Houston v. Hill*, 482 U.S. 451, 466-67 (1987) (finding an ordinance to be substantially overbroad when its "plain language is admittedly violated scores of times daily" but only some individuals are prosecuted in the discretion of the police).

was considerable concern about the effects of the statute. At least two incidents in which the law was being used had sparked the Legislature's concern: (1) county commissioners in Dallas being brought before a grand jury,[190] and (2) the prosecution of the Bosque County Judge.[191] Jim Allison, representing the County Judges & Commissioners Association of Texas testified before a House subcommittee, "The problem with the present statute, is that it is both ambiguous and unconstitutional."[192] Allison favored enacting both the "governing body" exception and the language that limited the definition of coercion to threats "to unlawfully take or withhold action"[193] (which was added by Representative Parker's amendment).[194] The HRO bill analysis cited some people's concern that adding an exception for members of governing bodies "would not go far enough in protecting public officials from unwarranted prosecution under the coercion statute" and that the statute "should be clarified to apply only to threats by public officials to take *unlawful* action."[195]

As we have explained, the Legislature responded to these concerns with a two-pronged fix: (1) adding the "governing body" exception and (2) inserting the word "unlawfully" in the "take or withhold action" portion of the definition of "coercion."[196] With this fix, the Legislature and all

---

[190] Rep. Wolens, 71st Leg., Committee on State Affairs, H.B. 594 (February 20, 1989).

[191] HRO Bill Analysis (SUPPORTERS SAY paragraphs two and three).

[192] Jim Allison, 71st Leg., Committee on State Affairs, H.B. 594 (February 20, 1989).

[193] *Id.*

[194] *See* 71st Leg., H.B. 594, introduced version (January 24, 1989); *supra* n.148 and accompanying text.

[195] HRO Bill Analysis (OTHER OPPONENTS SAY paragraph one) (emphasis in original).

[196] Acts 1989, 71st Leg., ch. 67, § 1, 2. The Legislature also added another method of committing coercion of a public servant: to influence or attempt to influence "a public servant to violate the public servant's known legal duty." *Id.* § 3.

other public officials in Texas had every reason to believe that the problem was solved.

Meanwhile, the Bosque County case that was pending during the legislative session made its way to the Waco Court of Appeals. The Waco court held that the statute under which Judge Hanson was prosecuted (before the Legislature amended it) was unconstitutionally vague as applied to her conduct.[197] The court declined to address the facial constitutionality of the statute, with respect to overbreadth or otherwise.[198]

In 1994, with the overhaul of the Penal Code, the second half of the Legislature's two-pronged solution was rescinded, but the *Hanson* opinion had been issued by then, and public officials had reason to believe that it would prevent prosecutions like the one against Judge Hanson. The continued existence of the "governing body" exception could also have been reasonably seen as a roadblock to such prosecutions. The ruling sought by the State today would reintroduce the very chilling effect that *Hanson* and earlier legislative action eliminated.[199] We conclude that the portion of Penal Code § 36.03(a)(1) at issue here, as it incorporates § 1.07(a)(9)(F), is unconstitutionally overbroad in violation of the First Amendment.[200] We overrule the State's challenges to the court of appeals's disposition of Count II.

---

[197] *Hanson*, 793 S.W.2d at 273.

[198] *Id.*

[199] *See Johnson*, 475 S.W.3d at 882.

[200] We need not address the State's complaint that the court of appeals conflated the tests for overbreadth and content-based restrictions. The unconstitutional applications of the statute are substantial in relation to the statute's legitimate sweep regardless of what level of scrutiny is employed. Nor are we called upon to address the substantial question of whether a threat designed to induce a public servant to resign constitutes an attempt to influence the *specific* performance of the public servant's official duty under the coercion statute.

## IV. Disposition

We reverse the judgment of the court of appeals as to Count I and affirm the judgment of the court of appeals as to Count II.  We remand this case to the district court to dismiss the indictment.

Delivered: February 24, 2016
Publish