

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| EX PARTE CESAR CARRASCO, | § | No. 08-25-00004-CR |
| Appellant. | § | Appeal from the |
| | § | 327th District Court |
| | § | of El Paso County, Texas |
| | § | (TC# 20220D05846) |

## MEMORANDUM OPINION

Appellant Cesar Carrasco was charged by indictment with multiple counts of sexual abuse of a child under the age of 14 years, aggravated sexual assault of a child, and indecency with a child by sexual contact. At trial, the child-victim testified that she had undergone a medical examination after she made an outcry to her father, and Carrasco moved for a mistrial based on the State's failure to provide him with the records of that examination prior to trial. The prosecutors denied any prior knowledge of the examination and denied that the records were in the State's possession. They opposed the mistrial and requested a continuance until the records could be obtained. Carrasco opposed the continuance, asserting he needed sufficient time to retain an expert

to review the records. After a series of hearings, the trial court granted the motion for mistrial on manifest necessity grounds but found that the State had not engaged in prosecutorial misconduct.

Carrasco then filed an application for writ of habeas corpus, contending the State had engaged in prosecutorial misconduct, which compelled him to file his motion for mistrial, and his right to be free from double jeopardy would be violated if he were prosecuted in a second trial. After the trial court denied the application, Carrasco filed this interlocutory appeal arguing the trial court abused its discretion in denying his application. The State counters that the trial court did not deny the application on the merits and its order is therefore not appealable. In the alternative, the State maintains the trial court properly denied the application because Carrasco failed to establish that the State engaged in misconduct that intentionally provoked him into making his motion. We consider the trial court's order to be on the merits and conclude that Carrasco did not establish he was entitled to habeas relief.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Carrasco was indicted in December 2022 on one count of sexual abuse of a child under the age of 14 years, six counts of aggravated sexual assault of a child, and 12 counts of indecency with a child by sexual contact, occurring between March 2014 and September 2016. All of the counts involved the same child-victim, whom we identify as J.G.[1] Before trial, the State elected to proceed only on the first four charges, to include one count of sexual abuse of a child under the age of 14 years, two counts of indecency with a child by sexual contact, and one count of aggravated sexual assault of a child, all occurring in March 2014.

---

[1] Because the complaining witness was a minor at the time of the alleged abuse, we refer to her by initials to protect her identity. *See* Tex. R. App. P. 9.10(a)(3).

**A. Testimony prior to the mistrial**

Carrasco's trial began on July 3, 2024. The first witness was Angel, J.G.'s father. Angel testified that he and J.G.'s mother, Genoveva, separated when J.G. was five years old and she was granted custody of J.G. Angel recalled that Genoveva did not allow regular visitation between him and J.G. until 2017, when she was 13.

In the interim, Angel recalled, Carrasco began living with Genoveva, J.G., and her two brothers. He testified that sometime in 2017 when he was picking up J.G. and her brothers, he observed J.G. leaving what he believed was the master bedroom and believed she had been alone in the bedroom with Carrasco, who was wearing shorts and no shirt. He voiced his concerns with Carrasco, the two exchanged blows, and Angel left.

Shortly thereafter, in July 2017, Angel asked J.G. if Carrasco—who had since moved out of the home—had molested her. Angel testified that she nodded yes and began crying. Because he was uncomfortable talking to J.G. about the abuse, he enlisted his niece, Annette, J.G.'s cousin, to discuss the details with her. Annette testified that when she first spoke with J.G., she was "very upset," crying, and appeared to be "scared" and "ashamed." After asking J.G. if something had "happened" involving Carrasco and seeing J.G. "struggling" to respond, she asked additional questions, including whether her "pee pee" had been hurt, referring to her vagina. Although Annette did not testify to J.G.'s response, she said J.G. appeared to be "ashamed, like she had done something wrong." Annette and Angel thereafter took J.G. to the police station to report the alleged abuse. Angel recalled that Child Protective Services (CPS) contacted him the next day.

Joe Zimmerly, a forensic interviewer at the Advocacy Center for Children in El Paso, interviewed J.G. on July 27, 2017, shortly after her outcry. Zimmerly testified that he initially engaged in a rapport-building conversation with J.G., then ascertained that she knew the difference

3

between a truth and a lie. When he asked J.G. if she knew "why she was there," Zimmerly recalled her "demeanor shift[ed]" and she became more "emotional" and appeared to be on the "verge of tears" at times. He further recalled that although J.G. had difficulty articulating details, she made an outcry during the interview. He testified that J.G. was able to identify her "private parts," and he confirmed her understanding of what had happened by using anatomically correct dolls for "clarification purposes."

The State also called Yasmine Perez, Director of Client Services at the Center Against Sexual and Family Violence, as an expert witness to testify to the typical grooming process in which a perpetrator initially gains a child-victim's trust, then isolates them, and eventually engages in escalating touching and abuse. Perez testified that children do not typically report abuse immediately for fear of recrimination, particularly when the perpetrator is a trusted adult. Perez explained that when there is a delayed outcry of more than 120 hours, such as in the present case, a SANE (Sexual Assault Nurse Examiner) examination will typically not be performed as there must be "some type of evidence to collect." Although it would be "very rare," she acknowledged the possibility that an exam could be performed after 120 hours.

J.G., who was 20 years old at the time of trial, testified that her mother began dating Carrasco when she was ten years old and in the fifth grade. She said she regularly went to Carrasco's apartment alone after school because her mother often worked in the afternoons. According to J.G., Carrasco initially made her uncomfortable by asking her personal questions, such as if she was "dating" anyone, and by caressing her shoulders and putting lotion on her legs. She said the touching escalated one afternoon when Carrasco touched her "breast area" and her thighs. According to J.G., Carrasco later began touching her vagina, first over her clothes and thereafter under her underpants. She recalled that when touching her, Carrasco would press his

4

penis against her back. J.G. testified that Carrasco touched her breasts and vagina in this manner "multiple times" between 2014 and 2016, both in Carrasco's apartment and later when Carrasco moved into their home when she was 11 years old. J.G. also testified that both before and after Carrasco moved into the family's home, he penetrated her vagina with his penis on multiple occasions.

After Carrasco moved out of the house, J.G. testified, she reported the abuse to her father then spoke to her cousin Annette and the police about it. On cross-examination, defense counsel asked if she had any recollection of undergoing a medical examination after her outcry. In response, J.G. testified that she "got a rape kit" at an El Paso hospital at the same approximate time of the investigation. When the State asked what she believed constituted a "rape kit," J.G. replied that she believed it was a "test inside your vagina, like, to–for semen." She recalled that at the hospital, she was told that "after a certain period of time it won't show up because it happened a long time ago." However, she testified that nevertheless, the medical staff conducted a physical examination and she believed "[t]hey were trying to find . . . mostly bruises or any kind of markings."

### B. Carrasco's motion for mistrial

After J.G.'s testimony, defense counsel told the trial court that the State had failed to disclose the "sexual assault" examination and failed to provide related records during discovery. Defense counsel requested a mistrial, asserting the withheld records "could be exculpatory depending on what the [medical staff] did," which was unclear at that time.

The two prosecutors in the case countered that they had been unaware that any type of sexual assault exam had taken place, pointing out that the CPS records, which defense counsel had prior to trial, indicated Angel had taken J.G. to Children's Hospital in El Paso but the staff was

unable to perform a SANE examination due to the passage of time. The prosecutors therefore believed J.G. was likely confused about the type of examination that had been conducted, if any.

To clarify, the trial court called J.G. to testify outside the jury's presence regarding the examination. She testified that while at the hospital, "they had to examine [her] vagina," and she confirmed that they touched her during the examination.

The prosecutors again informed the court that they had not been aware of any such examination, and they did not have J.G.'s medical records in their possession. They offered to subpoena the records and suggested that the proper remedy would be to continue the trial. Defense counsel argued that a continuance would not be an adequate remedy, as Carrasco would have to retain an expert to review the records and could not move forward in trial without an expert review. He therefore continued to request a mistrial. The trial court directed the State to subpoena the records and ordered the parties to return the next day at which time it intended to make its decision.

The next day, the parties informed the court that the State had subpoenaed the medical records from Children's Hospital and provided them to defense counsel. The records, which were admitted as exhibits, reflected that Angel took J.G. to the emergency room on July 28, 2017, for a SANE examination, reporting J.G. had been repeatedly sexually abused, with the last incident occurring in October 2016. According to the records, the medical staff had performed a general examination of J.G., but a "genital exam [was] deferred." However, the records reflected that J.G. was referred to the hospital's "MedCARES" clinic to make a follow up appointment.[2] The prosecutors explained that they were in the process of trying to obtain the clinic's records, which had been "archived."

---

[2] The medical staff took J.G.'s medical history, which included her allegation that she had repeatedly been sexually assaulted with the last incident occurring eight months prior, and staff performed a general medical examination of her, but no "genital exam."

Defense counsel again opposed a continuance, speculating that it could take up to a month to have an expert review the records, and that a mistrial was therefore the only adequate option. He further argued that the court should grant the mistrial on the basis of "prosecutorial misconduct," which would require the court to dismiss the case against Carrasco on double jeopardy grounds. Defense counsel maintained the State had the burden to disclose all evidence in its possession and accused it of "neglect" or "conscious indifference" in failing to properly investigate the case and obtain all relevant records. Defense counsel pointed out that he had been Carrasco's appointed counsel since 2017, and this was the first time he had been informed of the possibility that a SANE examination had been performed. He acknowledged, however, that six or seven prosecutors had been assigned to the case throughout its pendency and he did not necessarily blame the current prosecutors for any wrongdoing.

The prosecutors again denied that the State engaged in any wrongdoing, asserting that they had no reason to believe that a SANE exam had been performed until J.G. testified at trial. In support, the prosecutors tendered the CPS record as an exhibit, which indicated J.G.'s father had informed a CPS caseworker that although he took J.G. to Children's Hospital, no SANE exam had been performed due to J.G.'s delayed outcry.[3] They also noted that the law enforcement records contained no SANE exam references. And they pointed to Perez's testimony that a SANE examination will not generally be performed when there is a delayed outcry of more than 120 hours.

The State found it significant that defense counsel had subpoenaed the CPS records and was therefore aware Angel had taken J.G. to Children's Hospital. The State argued Carrasco could

---

[3] The CPS records reflected that Angel informed a CPS investigator on July 31, 2017, that he had taken J.G. to "get examined at Children's," but J.G. "was not able to have a SANE exam due to how much time has passed."

have sought the hospital records prior to trial if he believed they might be relevant. Pointing out that it had no "control" over the hospital, the State maintained the hospital's records could not be considered in its possession or control prior to trial.

Following the hearing, the trial court granted a mistrial based on "manifest necessity."

## C. Evidence of the SANE examination

The State thereafter received the records from the MedCARES clinic on June 21, 2024, making them available to defense counsel the same day. The records indicated J.G. had a follow-up visit at the clinic on August 22, 2017, for a "possible sexual assault." The clinic records indicated a SANE nurse examined J.G., but the record does not appear to contain any examination findings. The records contained a handwritten statement from J.G. indicating Carrasco had sexually abused her on multiple occasions; the SANE nurse's notes indicating J.G. informed her that her mother's boyfriend had repeatedly abused her since she was ten years old; and a statement from an unknown individual indicating Carrasco was a registered sex offender.[4] The clinic tested J.G. for sexually transmitted diseases.

## D. The motion to dismiss

Several months later, on October 21, 2024, Carrasco filed a motion to dismiss the indictment, contending the State had a duty under Texas Code of Criminal Procedure Article 39.14 to disclose J.G.'s SANE examination records during pretrial discovery, and its failure to do so amounted to "prosecutorial misconduct," which "compelled" him to move for a mistrial. According to Carrasco, the State either knew or should have known of the existence of J.G.'s

---

[4] J.G.'s statement indicated her mother's boyfriend, whom she identified as "Cesar," would tell her to remove her clothing and would remove her clothing "by force," and had "penetrated [her] private part . . . where [she] pee[s], like once a month," with the last incident occurring in either October of November 2016.

medical records based on the CPS records indicating Angel had taken J.G. to Children's Hospital for a SANE examination. Carrasco expressed skepticism that the State would not have asked Angel or J.G. whether a SANE exam had in fact been performed.

Opposing the motion, the State pointed out that because Carrasco moved for a mistrial, double jeopardy would only bar his retrial if he established the State engaged in misconduct with the specific intent to provoke him into requesting the mistrial. The State denied any such misconduct, again asserting it had been unaware that a SANE examination had taken place, and it was under no obligation to produce the records during pretrial discovery because it did not have the records in its possession prior to trial. The State noted that it acted promptly in subpoenaing J.G.'s medical records and tendering them to defense counsel once the examination came to light at trial.

By order dated November 1, 2024, the trial court denied the motion without holding a hearing.

### E.   The application for pretrial writ of habeas corpus

Shortly thereafter, on November 13, 2024, Carrasco filed his application for pretrial writ of habeas corpus seeking dismissal of the indictment based on his right to be free from double jeopardy. In his application, Carrasco raised virtually the same argument as he did in his motion to dismiss, again contending the State engaged in prosecutorial misconduct by failing to produce J.G.'s medical records during discovery, which "compelled" him to file his motion for mistrial. Without attaching any documents, Carrasco recounted J.G.'s trial testimony in the application and referred to the CPS and medical records in the trial court's file.

The State did not file an opposition to the application, and there is no indication that the trial court held a hearing on the application. On December 19, 2024, the trial court issued its

"ORDER ON APPLICATION FOR A WRIT OF HABEUS CORPUS," stating "the Court heard the Defense Motion Dismiss and the Court is of the opinion that the same should be . . . DENIED."

Carrasco appealed from the order, labeling it an "interlocutory appeal" from the trial court's denial of his writ application. Upon inquiry from this Court, the trial court certified Carrasco's right to appeal.

## II. ISSUES ON APPEAL

On appeal, Carrasco contends the trial court erred in denying his application for writ of habeas corpus, again arguing the State engaged in prosecutorial misconduct by failing to disclose J.G.'s medical records prior to trial, which compelled him to move for a mistrial. Again, he contends his right to be free from double jeopardy would be violated if the State is permitted to retry him. The State counters that the trial court did not deny the writ application on the merits and its order denying the writ is therefore not appealable; in the alternative, the State argues the trial court properly denied the application because Carrasco failed to establish that the State intentionally provoked him into moving for a mistrial.

## III. IS THE TRIAL COURT'S ORDER APPEALABLE?

Because of its jurisdictional nature, we first consider the State's argument that the trial court's order is not appealable. *See generally Ex parte Jeong*, No. 08-23-00264-CR, 2024 WL 3090528, at *1 (Tex. App.—El Paso June 21, 2024, no pet.) (mem. op., not designated for publication) (recognizing that an appellate court must determine whether it has jurisdiction over an appeal from the denial of defendant's application for a pretrial writ of habeas corpus) (citing *Ex parte Villanueva*, 252 S.W.3d 391, 393–94 (Tex. Crim. App. 2008)).

### A. Applicable law

"The purpose of a writ of habeas corpus is to obtain a speedy and effective adjudication of a person's right to liberation from illegal restraint." *Ex parte Kerr*, 64 S.W.3d 414, 419 (Tex. Crim. App. 2002) (citing *Blackledge v. Allison*, 431 U.S. 63, 71 (1977)); *see also* Tex. Code Crim. Pro. Ann. art. 11.01 ("The writ of habeas corpus is the remedy to be used when any person is restrained in his liberty."). An applicant accused of committing a felony offense who has not been convicted of the offense may apply for a writ of habeas corpus. Tex. Code Crim. Pro. Ann. art. 11.08. The Court of Criminal Appeals has deemed double jeopardy among the issues that are cognizable in a pretrial writ application. *See Ex parte Perry*, 483 S.W.3d 884, 895 (Tex. Crim. App. 2016).

In general, when a trial court receives an application for a writ of habeas corpus, it must initially review the application to "determine whether there is sufficient cause for the writ to be issued." *See Ex parte Carbajal*, No. 08-19-00238-CR, 2021 WL 1050059, at *2 (Tex. App.—El Paso Mar. 19, 2021, no pet.) (not designated for publication). A court is not required to issue the writ if it is "manifest from the petition itself, or some documents annexed to it, that the party is entitled to no relief whatever." *Id.* (citing *Lofton v. State*, 777 S.W.2d 96, 97 (Tex. Crim. App. 1989) (en banc) (recognizing that the court need not issue a writ if it is "manifest" from the face of the writ application that a petitioner is not entitled to relief)).

"[W]hen a court issues an order refusing to issue a writ of habeas corpus on jurisdictional grounds, without reaching the merits of the petitioner's underlying claims, there is no appeal from the court's order, as it is not considered a final judgment or order."[5] *Id.* at *3 (citing *Ex parte*

---

[5] When a trial court refuses to rule on or consider an application for habeas relief, the Court of Criminal Appeals has suggested two possible remedies: "first, to present the application to another trial judge with jurisdiction; or second, to file an application for a writ of mandamus." *See Ex parte Villanueva*, 252 S.W.3d 391, 394 (Tex. Crim. App. 2008)).

*Villanueva*, 252 S.W.3d at 395). However, when a trial court denies an application for a pretrial writ of habeas corpus on the merits, the trial court's order is appealable. *See Ward v. State*, 662 S.W.3d 415, 416 (Tex. Crim. App. 2020) (citing *Ex parte McCullough*, 966 S.W.2d 529, 531 (Tex. Crim. App. 1998)).

As the State points out, it is not always clear whether a trial court has ruled on the merits of the claims in a habeas petition or it has found that the claims did not justify the issuance of a writ. *See In re Martinez*, No. 04-15-00348-CR, 2015 WL 5032643, at *2 (Tex. App.—San Antonio Aug. 26, 2015, no pet.) (mem. op., not designated for publication) (recognizing that "[s]ometimes, it is difficult to determine whether the judge has granted the writ and denied habeas relief, or merely refused to issue the writ"). We must therefore review the entire record in determining whether a trial court's decision denying the writ was merits-based and therefore appealable. *Ex parte Jeong*, 2024 WL 3090528, at *1 (citing *Ex parte Bowers*, 36 S.W.3d 926, 927 (Tex. App.—Dallas 2001, pet. ref'd)).

**B. Analysis**

The State argues that nothing in the record reflects that the trial court's order denying Carrasco's writ application was merits-based, pointing out that the trial court did not expressly issue the writ nor did it hold a hearing, evidentiary or otherwise, on the application. The State therefore contends the trial court's order is not appealable and we should dismiss the appeal for lack of jurisdiction. We disagree.

There is no requirement for a trial court to formally issue a writ before denying a writ application on its merits; to the contrary, we may consider the writ to have been "impliedly issued" when it otherwise appears from the record that the court resolved the merits of the applicant's

claim. *Ex parte Carbajal*, 2021 WL 1050059, at \*3 (citing *Villanueva*, 252 S.W.3d at 395) (recognizing that even when the trial court has not formally issued a writ, if the court rules on the merits, the court has "in effect, issued the writ")).

Nor is there any requirement that the trial court hold a hearing before issuing a merits-based decision on a writ application. *See Ex parte Hargett*, 819 S.W.2d 866, 868 (Tex. Crim. App. 1991) (en banc) (recognizing that even though the trial court did not issue a writ or hold a hearing on the defendant's writ application, because the trial court clearly ruled on the merits of the application, the court of appeals was required to entertain the appeal); *see also Ex parte Villanueva*, 252 S.W.3d at 394 (recognizing that in *Hargett*, the court held "the trial judge's failure to explicitly issue the writ or hold a hearing on the merits of Hargett's claims was inconsequential," and his "appeal was authorized because an 'appeal can be had from a district court order denying an applicant relief on the merits of his claims'").[6] To the contrary, a trial court may render its decision on a defendant's pretrial writ application without holding an evidentiary hearing and may base its decision on other documents and evidence in the record before it. *See, e.g.*, *State v. Rushing*, 703 S.W.3d 356, 365 (Tex. App.—Beaumont 2017, pet. ref'd) (although no evidence was presented at the hearing on defendant's pretrial writ application, trial court could render a decision on the merits cause "based . . . on the circumstances and evidence presented during [the defendant's] trial").

Formalities aside, the "key question" in determining the appealability of an order denying a pretrial writ application is "whether or not the court addressed the merits of the petitioner's underlying claim." *Ex parte Carbajal*, 2021 WL 1050059, at \*3 (citing *Ex Parte Betancourt*, No.

---

[6] In *Villanueva*, the Court of Criminal Appeals noted that after *Hargett* was decided, the state legislature amended Article 11.07 of the Code of Criminal Procedure to provide that when an application for writ of habeas corpus is filed after final conviction in a felony case, other than a case in which the death penalty is imposed, the court clerk "shall assign the application to that court," and the writ "shall issue by operation of law." Tex. Code Crim. Pro. Ann. art. 11.07, § 3(b). *Villanueva*, 252 S.W.3d at 397.

08-05-00063-CR, 2006 WL 1875576, at *3 (Tex. App.—El Paso July 6, 2006, no pet.) (not designated for publication)); *see also Ex parte Jeong*, 2024 WL 3090528 at *1 ("Whether a trial court's disposition in a habeas proceeding may be appealed depends on whether the trial court considered and resolved the habeas application on its merits.") (citing *Greenwell v. Court of Appeals for the Thirteenth Judicial Dist.*, 159 S.W.3d 645, 649 (Tex. Crim. App. 2005); *Purchase v. State*, 176 S.W.3d 406, 407 (Tex. App.—Houston [1st Dist.] 2004, no pet.)). Here, we find support in the record that the trial court considered the merits of Carrasco's claim in denying his writ application.

First, as explained above, a trial court has jurisdiction to consider the merits of an applicant's double jeopardy claim in an application for a pretrial writ of habeas corpus. *See, e.g.*, *Ex parte Perry*, 483 S.W.3d at 895. Therefore, the trial court would have abused its discretion if it refused to consider Carrasco's writ application on jurisdictional grounds, and we may presume that the trial court did not refuse to consider the application on that basis.

Second, as explained above, in his writ application, Carrasco raised virtually the same claim that he made in moving for a mistrial. Rather than summarily denying Carrasco's argument in resolving his mistrial motion, the trial court held hearings in which it entertained his arguments and ultimately rejected Carrasco's claim of misconduct on the merits. Accordingly, we may presume that, rather than finding there was no basis for issuing the writ, the trial court once again determined that Carrasco's double jeopardy claim lacked merit and he was therefore not entitled to the relief he requested in his habeas application.

Third and finally, we note that in response to our order dated March 25, 2025, in which we directed Carrasco's counsel to demonstrate the basis for our jurisdiction to hear the appeal, counsel provided the trial court's certification of Carrasco's right to appeal. Because Carrasco would only

have the right to appeal if the trial court made a merits-based decision, the trial court's certification supports a finding that it denied Carrasco's writ application on the merits. *Cf Ex parte Mims*, No. 02-24-00324-CR, 2025 WL 647354, at *1 (Tex. App.—Fort Worth Feb. 27, 2025, pet. ref'd) (mem. op., not designated for publication) (where, upon appellate court's jurisdictional inquiry, the trial court provided a statement indicating that it did not reach the merits of defendant's pretrial writ application and that defendant had no right to appeal, appellate court concluded it lacked jurisdiction over the appeal).

In reaching this conclusion, we recognize that a trial court's certification of a defendant's right to appeal cannot, standing alone, support a conclusion that a trial court reached the merits of a habeas application, particularly if the certification is defective or appears contrary to the record. *See Ex parte Cayetano-Vazquez*, No. 08-23-00196-CR, 2023 WL 8609282, at *5 (Tex. App.—El Paso Dec. 12, 2023, no pet.) (mem. op.) (citing *Gonzales v. State*, No. 08-13-00066-CR, 2021 WL 3556653, at *3 (Tex. App.—Corpus Christi 2021, no pet.) (mem. op., not designated for publication) (when a certification of the right to appeal is defective, and there is no right to appeal, we do not have jurisdiction to hear the appeal); *Sherwood v. State*, 340 S.W.3d 929, 932–33 (Tex. App.—El Paso 2011, no pet.) (where trial court's certification of right to appeal did not accurately reflect the record, no right of appeal existed)). But here, we find no defect in the trial court's certification and there is otherwise sufficient evidence in the record to conclude the trial court made a merits-based decision.

Accordingly, we have jurisdiction to consider Carrasco's appeal and next examine whether the trial court abused its discretion in denying the application.

15

## IV. DID THE TRIAL COURT ABUSE ITS DISCRETION IN DENYING THE WRIT APPLICATION?

When contending the trial court abused its discretion in denying his writ application, Carrasco repeats the same arguments he made in the trial court. As to his double jeopardy argument, he argues that because the mistrial occurred after the jury was sworn in and jeopardy had attached to the proceedings, his double jeopardy rights would be violated by a retrial. We disagree.

### A. Applicable law and standard of review

Double jeopardy attaches once a jury has been sworn in. *Ex parte Fierro*, 79 S.W.3d 54, 59 (Tex. Crim. App. 2002) (en banc). But when, as here, a trial court grants a defendant's request for a mistrial, double jeopardy only bars a retrial if the State engaged in conduct that was intended to provoke or goad the defendant into requesting the mistrial. *Ex parte Lewis*, 219 S.W.3d 335, 371 (Tex. Crim. App. 2007) (citing *Oregon v. Kennedy*, 456 U.S. 667, 679 (1982)). Therefore, even if a defendant produces evidence of prosecutorial misconduct which "might be viewed as harassment or overreaching," and which may be sufficient to justify a mistrial, such evidence, standing alone, "does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause."[7] *Oregon v. Kennedy*, 456 U.S. at 675–676. As the Texas Court of Criminal Appeals has held, when a defendant's "mistrial motions were

---

[7] The United States Supreme Court explained the reasoning behind this rule, observing that "[a] defendant's motion for a mistrial constitutes 'a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact.'" *Oregon v. Kennedy*, 456 U.S. 667, 676 (1982) (quoting *United States v. Scott*, 437 U.S. 82, 93 (1978)). Therefore, "[o]nly where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." *Id.* at 676; *see also Ex parte Mitchell*, 977 S.W.2d 575, 579–80 (Tex. Crim. App. 1997) (en banc) (recognizing that only when "the prosecutor's intentional, and deliberate misconduct goads the accused into moving for a mistrial—and that motion is granted—is the accused's right to be tried to verdict by the first tribunal, a right afforded him by the double jeopardy clause of the Fifth Amendment, violated").

necessitated primarily by the State's 'intentional' failure to disclose exculpatory evidence that was available prior to [the defendant's] first trial with the specific intent to avoid the possibility of an acquittal," such "deliberate conduct, accompanied by this specific *mens rea*, bars a retrial." *Ex parte Masonheimer*, 220 S.W.3d 494, 507–08 (Tex. Crim. App. 2007).

A defendant applying for a pretrial writ of habeas corpus based on a claim that the State intentionally provoked him into seeking a mistrial bears the burden of proving his allegations by a preponderance of the evidence. *See Washington v. State*, 326 S.W.3d 701, 706 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (citing *Ex Parte Thomas*, 906 S.W.2d 22, 24 (Tex. Crim. App. 1995) ("The burden of proof in a writ of habeas corpus is on the applicant to prove by a preponderance of the evidence his factual allegations.")). The applicant also bears the burden of ensuring that a sufficient record is presented to show error requiring reversal on appeal. *Id*. (citing *Ex parte Chandler*, 182 S.W.3d 350, 353 n. 2 (Tex. Crim. App. 2005); *Ex parte Kimes*, 872 S.W.2d 700, 703 (Tex. Crim. App. 1993)).

We review a trial court's ruling on a pretrial writ of habeas corpus for an abuse of discretion and defer to the trial court's assessment of the facts, whether implied or express, which are supported by the record in making its ruling. *See Ex parte Wheeler*, 203 S.W.3d at 325–26. Thus, as in other contexts, we review the trial court's determination of "the prosecutor's state of mind" in the light most favorable to the trial judge's ruling and uphold it absent an abuse of discretion. *Id.* at 324 (recognizing "the importance of deferring to the trial court's assessment of the facts, including the prosecutor's state of mind"); *see also Ex parte Masonheimer*, 220 S.W.3d at 495 (recognizing that in determining whether the trial court abused its discretion in finding the defendant's motions for mistrial "were provoked primarily by the State's intentional failure to

17

disclose exculpatory evidence," court must view the record "in light most favorable to the trial court's ruling").

As it is often difficult to establish the State's intent, the Court of Criminal Appeals has listed the following nonexclusive factors to assist a court in assessing the prosecutor's state of mind:

> (1) Was the misconduct a reaction to abort a trial that was "going badly for the State"? In other words, at the time that the prosecutor acted, did it reasonably appear that the defendant would likely obtain an acquittal?
>
> (2) Was the misconduct repeated despite admonitions from the trial court?
>
> (3) Did the prosecutor provide a reasonable, "good faith" explanation for the conduct?
>
> (4) Was the conduct "clearly erroneous"?
>
> (5) Was there a legally or factually plausible basis for the conduct, despite its ultimate impropriety?
>
> (6) Were the prosecutor's actions leading up to the mistrial consistent with inadvertence, lack of judgment, or negligence, or were they consistent with intentional . . . misconduct?[8]

*Ex parte Wheeler*, 203 S.W.3d 317, 323–24 (Tex. Crim. App. 2006).

**B. Analysis**

Here, we conclude that in denying Carrasco's writ application, the trial court made an implied finding that the State did not intentionally provoke Carrasco into moving for a mistrial,

---

[8] In *Wheeler*, the Court of Criminal Appeals referred to its prior standard of whether the State's actions were "consistent with intentional or reckless misconduct." *Ex parte Wheeler*, 203 S.W.3d 317, 324 (Tex. Crim. App. 2006). However, the next year, the court eliminated the "reckless misconduct" standard, holding that only "intentional" conduct would give rise to a double jeopardy claim. *See Ex parte Lewis*, 219 S.W.3d 335, 371(Tex. Crim. App. 2007) (overruling its prior holdings in which it held that double jeopardy was violated by either reckless or intentional misconduct by the State).

and we must therefore apply the *Wheeler* factors in determining whether the trial court abused its discretion in making this finding.

As a preliminary matter, we note that the first two *Wheeler* factors have very little, if any, relevance to our analysis. First, the question of whether the trial was "going badly for the State" has no real bearing on the issue of whether the State's alleged misconduct in failing to disclose J.G.'s medical records goaded Carrasco into moving for a mistrial, as any such misconduct occurred *before* the trial started. And our independent review of the record fails to reveal the existence of any "glaring deficiencies" in the State's case that would support a finding that the State was in fear of an acquittal, such that they would have acted intentionally in provoking a mistrial by withholding any evidence from the defense. *See State v. Mutei*, No. 08-15-00056-CR, 2017 WL 542025, at *7 (Tex. App.—El Paso Feb. 10, 2017, pet. ref'd) (where child-victim testimony and other evidence supported the State's allegation of sexual abuse, court disagreed with appellant's contention that "the State's case was going so badly that it would have been motivated to intentionally provide a mistrial").

Second, the question of whether the State "repeated" the conduct "despite admonitions from the trial court" also has no real bearing on the issue of whether the State goaded Carrasco into requesting a mistrial, as again, the State's alleged misconduct occurred prior to trial and was therefore not subject to being "repeated" during the trial. In any event, as the State points out, Carrasco's motion for mistrial was based on a single discovery issue, and Carrasco did not accuse the State of engaging in any other discovery violations.

Of more relevance is the question of whether the State's conduct in failing to disclose J.G.'s medical records during discovery was "clearly erroneous," as this is the focal point of Carrasco's argument. According to Carrasco, the State violated Texas Code of Criminal Procedure Article

19

39.14 (the Michael Morton Act) in failing to produce J.G.'s medical records prior to trial, which in turn, goaded or provoked him into moving for a mistrial. We do not find that the State's failure to produce the records was a clear violation of the Code.

Article 39.14(a) provides that the State is required to timely provide:

> any offense reports, any designated documents, papers, written or recorded statements of the defendant or a witness, including witness statements of law enforcement officers . . . . or any designated books, accounts, letters, photographs, or objects or other tangible things not otherwise privileged that constitute or contain evidence *material to any matter involved in the action and that are in the possession, custody, or control of the state or any person under contract with the state*."[9]

Tex. Code Crim. Pro. Ann. art. 39.14(a) (emphasis added). The Texas Court of Criminal Appeals has interpreted the term "material" as used in this provision to mean "having a logical connection to a consequential fact" and as being "synonymous with 'relevant' in light of the context in which it is used in the statute." *Watkins v. State*, 619 S.W.3d 265, 290 (Tex. Crim. App. 2021).

Here, although J.G.'s medical records may have been "material" to Carrasco's case, nothing in the record supported a finding that the records were in the State's "possession, custody, or control" prior to trial so as to invoke the State's duty to produce the records during discovery. At trial, the prosecutors denied having any of the medical records in their possession prior to trial, and Carrasco does not appear to argue otherwise. However, Carrasco contends the State knew or should have known of their existence because the CPS records referenced the fact that Angel took J.G. to Children's Hospital seeking a SANE examination. Carrasco further notes that the hospital

---

[9] In addition, subsection (h) of the Code provides that "[n]otwithstanding any other provision of this article, the state shall disclose to the defendant any exculpatory, impeachment, or mitigating document, item, or information in the possession, custody, or control of the state that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged." Tex. Code Crim. Pro. Ann. Art. 39.14)(h). And subsection (k) provides that "[i]f at any time before, during, or after trial the state discovers any additional document, item, or information required to be disclosed under Subsection (h), the state shall promptly disclose the existence of the document, item, or information to the defendant or the court." *Id*. at 39.14(k).

records themselves included the names of two detectives who were investigating the case at the time. According to Carrasco, "[t]hese notations clearly indicate that the State" or its "agents" were "on notice" that an examination had taken place, and, therefore, they were under a duty to produce the records during pretrial discovery.

The fact that the State or its agents may have been "on notice" or "aware" that J.G. was taken to Children's Hospital for an examination does not constitute evidence that the State or any of its agents had the hospital records in their possession, custody, or control prior to trial. As the State points out, although it has a duty to reveal discoverable material to the defense "when the information comes into the state's possession . . . the state is not required to seek out exculpatory evidence independently on appellant's behalf, or furnish [a defendant] with exculpatory or mitigating evidence that is fully accessible to [the defendant] from other sources." *Harm v. State*, 183 S.W.3d 403, 407 (Tex. Crim. App. 2006) (citing *Jackson v. State*, 552 S.W.2d 798, 804 (Tex. Crim. App. 1976)). Nothing in Article 39.14 "imposes an affirmative duty on the State to seek out and disclose information that is outside the State's possession or create evidence that does not exist." *State v. Nunez*, 704 S.W.3d 598, 621 (Tex. App.—Houston [1st Dist.] 2024, pet. ref'd) (citing *In re State ex rel. Best*, 616 S.W.3d 594, 600 (Tex. Crim. App. 2021) (orig. proceeding)).

Prior to trial, the only entities in possession of J.G.'s medical records were the hospital and the clinic. As the State points out, nothing in the record suggests that either of these entities were under contract with the State or acting as State agents who had any duty to disclose the records to Carrasco absent a subpoena.[10] *See Arredondo v. State*, No. 07-22-00089-CR, 2023 WL 1415624,

---

[10] We recognize that law enforcement officers, and in some instances CPS workers, may be considered State agents with a duty to disclose evidence in their possession. *See State v. Heath*, 696 S.W.3d 677, 693–702 (Tex. Crim. App. 2024) (recognizing that an item under the exclusive control of law enforcement as an agent of the State is subject to disclosure) (citing *Pena v. State*, 353 S.W.3d 797, 811 (Tex. Crim. App. 2011)); *see also Harm v. State*, 183 S.W.3d 403, 407 (Tex. Crim. App. 2006) (recognizing that while "CPS case workers may be law enforcement officers or state

at *3 (Tex. App.—Amarillo Jan. 31, 2023, pet. ref'd) (mem. op., not designated for publication) (recognizing that Article 39.14(a) does not require the State to disclose evidence that is not in the possession of the State or an entity under contract with the State) (citing *Bennett v. State*, No. 03-21-00225-CR, 2022 WL 16973692, at *13–14 (Tex. App.—Austin Nov. 17, 2022, pet. ref'd) (mem. op., not designated for publication)). And as the State noted in the trial court, because Carrasco had the CPS records prior to trial, which indicated that J.G. had been taken to Children's Hospital, he could have taken steps to obtain them during the discovery process. Nothing in the record suggests he took any such steps.

Moreover, the prosecutors presented the trial court with a reasonable, good-faith explanation for their failure to produce J.G.'s medical records prior to trial, asserting they were not aware J.G. had undergone a SANE examination until the first day of trial when J.G. testified to that effect. The prosecutors' belief that a SANE examination had not taken place was factually supported by the record. As set forth above, the CPS records contained Angel's statement that no SANE examination had been performed given the delay in J.G.'s outcry, and the State's expert witness testified that a SANE examination is not typically conducted where there is such a delay between the last alleged instance of abuse and the outcry.

The trial court impliedly accepted this explanation when it found that the State had not engaged in any prosecutorial misconduct by failing to produce J.G.'s medical records during

---

agents in some circumstances, an examination of the entire record is required to determine whether a CPS employee was a state agent in a given situation") (citing *Cates v. State*, 776 S.W.2d 170, 171–72 (Tex. Crim. App. 1989) (mem. op., not designated for publication)); *but see State v. Bell*, No. 06-19-00139-CR, 2020 WL 111304, at *6 (Tex. App.—Texarkana Jan. 10, 2020, pet. ref'd) (holding that because CPS workers were not acting in the capacity as criminal investigators, they could not be considered agents of the State subject to disclosure requirements). Regardless of their status as State agents, however, there is no evidence that any of the law enforcement officers or the CPS workers who were involved in the investigation of the alleged abuse in the present case had possession, custody, or control, of any of J.G.'s medical records.

discovery, and we must defer to this finding in the absence of any dispositive evidence to the contrary. *See Ex parte Contreras*, No. 04-24-00290-CR, 2025 WL 610308, at *6 (Tex. App.—San Antonio Feb. 26, 2025, no pet.) (deferring to trial court's finding that the State did not intentionally provoke a mistrial by failing to produce evidence prior to trial where the trial court found that both the State and the defense became aware of evidence "for the first time during the first trial of [the] case" and where the State immediately turned the evidence over to the defense once the prosecutors became aware of it); *Ex parte Curtis*, No. 13-23-00030-CR, 2023 WL 8270655, at *6 (Tex. App.—Corpus Christi–Edinburg Nov. 30, 2023, pet. ref'd) (mem. op., not designated for publication) (upholding trial court's finding that the State did not engage in intentional misconduct by failing to disclose evidence prior to trial, where, among other things, prosecutors testified they were unaware of the evidence prior to trial and did not have it in their possession during discovery proceedings).

In addition, while J.G.'s medical records were material to Carrasco's case and therefore subject to disclosure under Article 39.14 (a), Carrasco has not explained how the records would have been favorable to his case. To the contrary, as the State notes, the records contained inculpatory evidence, including J.G.'s handwritten statement asserting Carrasco had abused her on multiple occasions and statements she made to the SANE nurse accusing Carrasco of repeatedly abusing her since she was ten years old. Carrasco has not provided any argument or pointed to any evidence to support a finding that the State had a strategic reason for purposely withholding such inculpatory material from defense counsel with the intent to provoke a mistrial, nor can we surmise one. *See Harmel v. State*, No. 03-15-00586-CR, 2016 WL 2342959, at *3 (Tex. App.—Austin Apr. 27, 2016, pet. ref'd) (mem. op., not designated for publication) (upholding trial court's finding

that the prosecutor did not act with intent to goad the defense into moving for a mistrial by withholding inculpatory evidence that was "devastating" to the defendant's case).

Finally, while we agree with Carrasco that the State may have been remiss in failing to fully investigate the case and in failing to determine whether a SANE examination had taken place, we find nothing in the record to support a finding that the State did so with any malice or intent to provoke a mistrial to avoid an acquittal. *See, e.g.*, *Ex parte O'Connor*, 2009 WL 3126254, at *3–6 (affirming trial court's denial of habeas relief where trial court found that the State's failure to produce evidence prior to trial was consistent with "inadvertence" rather than conduct intended to provoke a mistrial); *Ex Parte Lopez*, No. 2-06-232-CR, 2007 WL 1776061, at *3 (Tex. App.—Fort Worth June 21, 2007, pet. ref'd) (mem. op., not designated for publication) (holding that the State's failure to disclose evidence until after trial started was not an attempt to provoke a mistrial, but was instead a "prosecutorial blunder that was the result of inadvertence, sloppiness, or even simple negligence, none of which are bars to retrial").

Accordingly, we conclude that Carrasco did not meet his burden of establishing that the State engaged in misconduct with the intent to provoke him into moving for a mistrial, such that double jeopardy barred a second trial. Therefore, we hold the trial court did not abuse its discretion in denying Carrasco's application for a writ of habeas corpus.

Carrasco's sole issue on appeal is overruled.

## V.  CONCLUSION

We affirm the trial court's order denying Carrasco's application for a pretrial writ of habeas corpus and remand the matter to the trial court for further proceedings consistent with our opinion.

LISA J. SOTO, Justice

August 28, 2025

Before Salas Mendoza C.J., Palafox and Soto, JJ.

(Do Not Publish)